409 P.2d 17

**STATE of Arizona, Appellee,**

v.

**Robert Lee SIMS, Appellant.**

No. 1468.

Supreme Court of Arizona.

En Banc.

Dec. 16, 1965.

Rehearing Denied Jan. 11, 1966.

**304**

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, former Atty. Gen., Norman E. Green, County Atty. of Pima County, William J. Schafer, III, First Asst. County Atty. of Pima County, John L. Augustine, Deputy County Atty. of Pima County, for appellee.

William E. Hildebrandt, Tucson, for appellant.

STRUCKMEYER, Vice Chief Justice.

Appellant Robert Lee Sims and one Leo G. Davis were charged with the murder of Glendell M. Soape. Davis entered a plea of guilty, testified for the State and thereafter received a sentence of life imprisonment. Sims was convicted of first degree murder by a jury which fixed the punishment at death. From the conviction and sentence, this appeal by Sims has been taken.

On May 23, 1963, near the town of Sahuarita, in Pima County, Arizona, the body of Soape, an insurance salesman, was found in a barley field a short distance from the side of a dirt road. At the edge of the road were the footprints of two men and a woman. At the time the body was found, the only apparent wound was a laceration over the right eye. Subsequently, it was determined from an autopsy that Soape died from a blow which shattered the first cervical vertebra in his neck.

Both Sims and Davis lived in a cotton camp near the outskirts of Sahuarita. Davis was a cotton chopper and Sims was

a supervisor of cotton choppers. Georgia Mae Marchman, age 27, an admitted prostitute, was at this time living with Sims as his wife. Marchman left Sahuarita about a week after Soape's death and the State was unable to take a statement from her until she was located in Texas in October, 1963. Marchman then returned to Pima County, Arizona, and an information charging Sims and Davis with the murder of Soape was filed.

The testimony of Marchman and Davis proved the corpus delicti of the crime, establishing that on the evening of May 23, 1963, Soape came into Mary's Bar in Sahuarita and struck up a conversation with Davis. In the course of the conversation, Soape asked Davis about getting a girl. Davis shortly thereafter spoke briefly to Sims who left the bar and returned with Marchman. She went over to Soape and told him the price would be $5.00. Soape then went with her in an automobile belonging to Sims to the house in which she and Sims lived. Afterwards, as they were returning to the bar, Soape suggested to Marchman that they go to Nogales, Mexico, a distance of about 45 miles. She told Soape that she did not have a driver's license and, in effect, that it would be necessary to get a driver for the automobile.

Marchman saw Sims and told him about Soape's desire to go to Nogales. As the three were preparing to leave, Davis walked past them and Sims called to him and asked him to go to Nogales with them. The four, Sims, Davis, Marchman and Soape then started out on the highway which would take them to Nogales. Sims and Davis were in the front seat, Sims on the left-hand side driving the automobile. Soape and Marchman were in the rear seat, Soape seated behind Sims and Marchman behind Davis.

A short time after leaving Sahuarita, the car seemed to stall and Sims and Davis got out. Sims raised the hood and said to Davis, out of the hearing of Marchman and Soape, "Let's roll this fellow," and Davis said, "Okay," and they then re-entered the car. After a few miles, Sims, without saying anything, turned off the highway onto a dirt road. Soape immediately asked where they were going, whereupon Davis struck him over the head with a cotton spinner, either stunning him or rendering him unconscious. Sims then stopped the car, got out and opened the rear door. He pulled Soape from the back of the car onto the road. While Soape lay on the road, Sims kicked him in the back of the head. Sims then dragged Soape a short distance into a barley field.

Davis testified:

"Q What did you do, Mr. Davis, after getting out of the car yourself?

"A I went out to the barley field.

"Q Did you do anything before reaching the barley field?

"A No.

"Q What did you do when you reached the barley field?

"A I went over to where Mr. Soape was laying and took his watch off of his arm.

"Q Where was Mr. Sims at this time?

"A By Mr. Soape's body.

"Q What did you observe him doing, if anything?

"A He was handing a wallet to Miss Marchman.

"Q Did you see where Mr. Sims got the wallet?

"A No.

"Q What did you do with Mr. Soape's watch?

"A Gave it to Mr. Sims."

Georgia Mae Marchman testified:

"Q * * * Did you see Mr. Sims do anything else when he was with the body in the field?

"A He turned him over.

"Q Did he do anything else that you saw?

"A Yes.

"Q What?

"A He went in his back pocket.

"Q And did you see what he did there?

"A He taken something out.

"Q How do you know that?

"A Because he called me and told me to take this and hide it.

"Q What was it, do you know?

"A It was a wallet.

"Q Did you see this?

"A I saw it.

"Q What did you do with it?

"A I put it in my bosom."

Sims argues that Davis and Marchman were accomplices whose testimony must necessarily be corroborated under A.R.S. § 13–136. The statute provides:

"A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which, in itself and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

█ The word "accomplice" is not defined in the statute, but we have repeatedly held that the test to determine whether a witness is an accomplice is whether

the witness could be informed against for the same crime which the defendant stands accused. State v. Howard, 97 Ariz. 339, 400 P.2d 332; State v. Miller, 71 Ariz. 140, 224 P.2d 205; State v. Green, 60 Ariz. 63, 131 P.2d 411. Generally, it is said, the test is whether the witness could be charged and convicted of the same crime for which defendant is accused.

It should be immediately stated that without the testimony of Marchman there is no legally sufficient evidence to connect Sims with the offense of Soape's murder for admittedly Davis was an accomplice to the crime of robbery and hence to the felony murder accompanying it. The problem implicit in the statement of the foregoing facts is the legal effect to be given to Marchman's acceptance of Soape's wallet from Sims, this being her only connection with the robbery. She testified on direct examination:

"Q Now Georgia, when you were in the car going down the Nogales Highway, did you know that the car was going to turn off to the left?

"A No.

"Q Did you know what Mr. Sims or what Nogales [Davis] were going to do?

"A No.

"Q Did you have any conversation with them at all about what was going to happen?

"A No.

"Q Did you know that Mr. Soape, the white man, was going to be hit?

"A No.

"Q Did you know that anything was going to be taken from him?

"A No."

She testified on cross-examination:

"Q Now you said when Sims and Davis were under the hood they seemed to be working on the engine. Is that right?

"A I said they was under the hood. I don't know what they were doing.

"Q What did you think they were doing?

"A Well, if the car stopped I figured they was fixing something.

"Q And you could hear them talking but you couldn't actually hear what they said. Is that right?

"A I couldn't hear them talking. I didn't say they were talking. I said they were under the hood.

"Q Well, could you hear them talking?

"A I didn't hear them say anything.

"Q Now understand this, Georgia. I am not asking you whether you understood what they said; I am simply asking if you heard them talking.

"A I didn't hear them say anything."

■ Unquestionably, in the absence of preconcert, the mere presence of a person at the time and place of a crime does not make an aider, abettor or principal. United States v. Williams, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747; People v. Hill, 77 Cal. App.2d 287, 175 P.2d 45; People v. Barnes, 311 Ill. 559, 143 N.E. 445; Johnson v. State, 227 Md. 159, 175 A.2d 580; State v. Johnson, 57 N.M. 716, 263 P.2d 282; Moffett v. State, 151 Tex.Cr.R. 320, 207 S.W.2d 384; James v. State, 144 Tex.Cr.R. 126, 161 S.W.2d 285. The Court, in James v. State, summarized our understanding of the principle here applicable:

"The mere presence of appellant when the soldier struck Mr. Locklar and rendered him unconscious in the absence of previous agreement to rob him, in the absence of aid or encouragement to the soldier in his act of violence, in the absence of knowledge on appellant's part of the soldier's intent, would not render appellant guilty of robbery, however reprehensible his conduct may have been in subsequently taking or participating in the taking of Mr. Locklar's property." 161 S.W.2d at 289.

Cf. State v. Bearden (Sept. 29, 1965) 99 Ariz. 1, 405 P.2d 885, and State v. George, 95 Ariz. 366, 390 P.2d 899.

■ Nor does the mere receipt of stolen property render the receiver an accessory after the fact to a robbery notwithstanding that there was knowledge that the property was stolen. Smith v. State, 229 Ind. 546, 99 N.E.2d 417, and authorities collected and cited. The weight of authority is that a receiver of stolen property, knowing it to have been stolen, is not an accomplice whose testimony must be corroborated to sustain a conviction of theft, burglary or robbery. State v. Bowman, 92 Utah 540, 70 P.2d 458, 111 A.L.R. 1393, and annotation 1398. While we have not passed on the question of whether the receiver of stolen property is an accomplice to the theft, we have twice answered the converse, holding that the thief is not an accomplice of the receiver of stolen property. Reser v. State, 27 Ariz. 43, 229 P. 936; Leon v. State, 21 Ariz. 418, 189 P. 433, 9 A.L.R. 1393. In Leon, we did note that, "A person who steals property and one who afterwards receives it from him, knowing it to have been stolen, are guilty of separate offenses, and, without more, neither is an accomplice of the other." (21 Ariz. at 423, 189 P. at 435.)

Sims argues that if Marchman could be informed against either as a principal or accessory for the crime with which he is charged, she is an accomplice. Our attention has been directed to a number of Arizona cases, but we think they are distinguishable. In no case was the purported accomplice an accessory after the fact;

rather, in each, he was found to be an actual participant in the offense.

■ In Arizona, by statutes §§ 13–138 and 13–139, the distinction between an accessory before the fact and principal is abolished. Included as principals subject to prosecution are those persons who were, under the common law, accessories before the fact; that is, though not being present at the time and place of the offense advised and encouraged its commission or in some manner aided or abetted in its commission. By § 13–141, an accessory is defined as, "All persons who, after full knowledge that a felony has been committed, conceal it from the magistrate, or harbor and protect the person charged with or convicted thereof * * *." This section is the equivalent of the common law accessory after the fact. It sets up a distinct, independent offense for which the punishment is prescribed in the subsequent section, A.R.S. § 13–143. Such a person is not subject to punishment and prosecution as a principal under § 13–140, supra. See People v. Wallin, 32 Cal. 2d 803, 197 P.2d 734, for an extended discussion of similar statutes in which the same conclusion was reached as here expressed.

■ Any statements in our former opinions which seem to include accessories within the meaning of § 13–141 as accomplices must be read as meaning common law accessories before the fact, those punishable as principals by § 13–139. Accessories after the fact are not accomplices to the principal crime. Belser v. State, 16 Ala. App. 504, 79 So. 265; People v. Conrad, 125 Cal.App.2d 184, 270 P.2d 31; State v. Gilbert, 65 Idaho 210, 142 P.2d 584; State v. Philpott, 222 Iowa 1334, 271 N.W. 617.

■ After the jury found Sims guilty and sentence was imposed, he moved for a new trial in the superior court. This motion was denied. Thereafter, he filed his notice of appeal. While the appeal was pending, Sims filed, in this Court, a supplementary motion for a new trial based upon newly discovered evidence. We sent the supplementary motion for a new trial to the superior court for determination. There, the supplementary motion was denied. Sims now urges that it was error for the superior court to rule upon his supplementary motion for new trial, asserting that the superior court was without jurisdiction from the time the notice of appeal was filed.

Nothing in our former pronouncements is inconsistent with the procedure followed in the instant case. Our order directing the superior court to determine the supplementary motion for a new trial was a remand for a limited purpose and reinstated the jurisdiction in the superior court to take the necessary and appropriate action. By A.R.S. § 13–1716, this Court is empowered to reverse, affirm or modify a judgment appealed from and,

**310**

"\* \* \* may \* \* \* render any judgment or make any order which is consistent with the justice and the rights of the state and the defendant."

Sims also urges that the superior court abused its discretion in overruling his supplementary motion for a new trial. His motion was made under Rule 310(3), Rules of Criminal Procedure, 17 A.R.S. That rule provides for a new trial where "new and material evidence, which if introduced at the trial would probably have changed the verdict or the finding of the court, is discovered which the defendant could not with reasonable diligence have discovered and produced upon the trial." The asserted newly discovered evidence consisted, in part, of an affidavit and deposition by Davis in which he recanted his testimony at the trial and asserted that he perjured himself.

The much quoted opinion of People v. Shilitano, 218 N.Y. 161, 112 N.E. 733, L.R.A.1916F, 1044, points out the inherent danger in a rule that the recantation by witness for the prosecution necessarily entitles a defendant to a new trial. Were this an arbitrary rule, the power to give a convicted defendant a new trial would rest not with the court but with the witnesses who testified against him. The New York Court commented that:

"There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character." 218 N.Y. 161, at 170, 112 N.E. 733, at 736.

Such recanting affidavits of the sort here involved have been characterized as newly discovered perjury, not newly discovered evidence. Loucheim v. Strause, 49 Wis. 623, 6 N.W. 360.

■■ It should not be overlooked that Davis is serving a life sentence for his participation in the crime. He has little to lose by now assisting Sims to avoid the death penalty. This is not to say that a new trial may never be granted on recanted testimony. The credibility of the recanted evidence is a controlling factor which can best be made in the court that heard the original testimony. In the absence of an abuse of discretion, the trial court's decision on recanted testimony will not be disturbed on appeal. State v. Goff (Oct. 25, 1965) 99 Ariz. 79, 407 P.2d 55.

■ In addition, on his supplementary motion for a new trial, Sims set forth that after the trial he remembered he had purchased some hogs on the night in question. But recollection after a trial is concluded does not constitute newly discovered evidence because by its general nature it deals with the known while discovery deals with the unknown. Information within the personal knowledge of a defendant does not

become newly discovered evidence by reason of later recollection. State v. Daymus, 93 Ariz. 332, 380 P.2d 996.

Sims also submitted the affidavit of one Watkin Jackson from whom Sims purchased hogs. Jackson deposed that he had a written record containing the date of the sale to verify the fact that he did make such a sale to Sims early in the evening of the night of the murder. Generally, applications for a new trial to permit the introduction of the testimony of a witness whose identity was known by a moving party at the time of the original trial are denied. See Annot. 92 A.L.R.2d 992, 1001. This is particularly true of an alibi. People v. Delgado, 37 Cal.App. 807, 175 P. 24; State v. Moore, 41 Utah 247, 126 P. 322; United States v. Malfetti, 117 F.Supp. 468 (D.C.N.J., 1954), affirmed 3 Cir., 213 F.2d 728; State v. Pittman, Mo., 221 S.W.2d 163; State v. Sonnenschein, 37 S.D. 139, 156 N. W. 906.

More important, however, the proposed testimony of Jackson would not have changed the verdict. Jackson deposed that shortly before 5:30 p. m. on May 23, 1963, Sims came to his ranch house about twelve miles from Sahuarita to purchase some pigs, that they met at the pig pen about two and one-half miles away from the ranch house and the ones selected were loaded onto Sims' truck, that Sims left near sunset, about 7:00 o'clock. Soape is first placed by Davis at the bar in Sahuarita after dark where they talked about a girl for Soape. Sims, therefore, had ample time to return to Sahuarita with the pigs and be present at the conversation with Davis.

Sims finally urges that the testimony of Davis and Marchman at the trial contain certain contradictions and discrepancies. These asserted contradictions and discrepancies are of such a nature as can and usually do occur in the course of most trials where much of the evidence is dependent upon the recollection of witnesses. We do not think they are such as to materially discredit the testimony of either witness. On the whole, the testimony of Davis and Marchman is consistent in important and significant details. It is, moreover, consistent with the other evidence in the case, such as, for example, the footprints found at the site of the murder, one set being identified as having been made by shoes of the same size as worn by Sims.

The judgment of the court below is affirmed.

LOCKWOOD, C. J., and BERNSTEIN, UDALL, and McFARLAND, JJ., concur.