755 P.2d 434

**STATE of Arizona, Appellant,**

v.

**Allen R. MILLER, Appellee.**

**No. 1 CA–CR 11000.**

Court of Appeals of Arizona,
Division 1, Department C.

Feb. 4, 1988.

Reconsideration Denied March 17, 1988.

Review Denied June 28, 1988.

---

2. *Darner Motor Sales v. Universal Underwriters,* 140 Ariz. 383, 682 P.2d 388 (1984).

130

John Verkamp, Coconino Co. Atty. by Jon W. Thompson, Deputy Co. Atty., Flagstaff, for appellant.

Aspey, Watkins & Diesel by Bruce S. Griffen, Wendy F. White, Flagstaff, for appellee.

## OPINION

KLEINSCHMIDT, Judge.

Allen Miller was indicted on one count of theft in violation of A.R.S. § 13–1802. Prior to trial, his motion to dismiss the prosecution for lack of jurisdiction was granted. The state appealed pursuant to A.R.S. § 13–4032(1). We affirm the dismissal.

Jerry Farmer and Julie Hart stole eleven diamond rings from a J.C. Penney store in Flagstaff, Arizona. They traveled to Durango, Colorado, with the rings in their possession. In Durango, Farmer and Hart met Allen Miller, the defendant in this case. Farmer and Hart did not know Miller prior to their meeting in Durango.

Farmer told Miller about the rings, and Miller agreed to help dispose of them in Las Vegas, Nevada. Miller and his new companions traveled to Las Vegas and sold some of the rings. They did not re-enter Arizona. Miller was given two of the rings in payment. He was subsequently arrested in Utah and extradited to Arizona.

The issue on appeal is whether the trial court erred in dismissing the charge of theft against Miller. The state asserts that Arizona has jurisdiction to prosecute Miller under A.R.S. § 13–108. That statute, in pertinent part, reads as follows:

A. This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which such person is legally accountable if:

1. Conduct constituting any element of the offense or a result of such conduct occurs within this state; or

2. The conduct outside this state constitutes an attempt or conspiracy to commit an offense within this state and an act in furtherance of the attempt or conspiracy occurs within this state; or

\*　\*　\*　\*　\*　\*

4. The offense consists of an omission to perform a duty imposed by the law of this state regardless of the location of the defendant at the time of the offense[.]

\*　\*　\*　\*　\*　\*

Based on this statute the state asserts four theories that it claims give Arizona courts jurisdiction over Miller. They are:

(1) that Miller's conduct produced a "result" in Arizona;

(2) that Miller failed to perform a duty required under Arizona law;

(3) that Miller was an accomplice to a crime committed in Arizona; and

(4) that Miller was a conspirator to a crime committed in Arizona.

Because these theories raise questions about the extent of Arizona's power to punish conduct that occurs outside the state, they are governed by principles of international law. Although the theories are intertwined, we will discuss each of them separately.

### INTERNATIONAL LAW APPLIES

■ We look to international law to determine whether the state may assert jurisdiction based upon a statute that attempts to punish extraterritorial conduct. In *Skiriotes v. Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941), *reh'g denied* 313 U.S. 599, 61 S.Ct. 1093, 85 L.Ed. 1552, the Supreme Court, in upholding a state's jurisdiction over the extraterritorial acts of one of its own residents, observed that international law "is a part of our law and as such is the law of all States of the Union." *Id.* at 72–73, 61 S.Ct. at 927, 85 L.Ed. at 1198.

The Supreme Court has also recognized that international law applies to the states of the United States in their relations with one another except as modified by the federal constitution. *Kansas v. Colorado*, 185 U.S. 125, 146, 22 S.Ct. 552, 560, 46 L.Ed. 838, 846 (1902); *see also Sinclair Pipe Line Co. v. State Comm'n of Revenue and Taxation*, 184 Kan. 713, 718, 339 P.2d 341, 346 (1959).

The parameters of A.R.S. § 13–108, Arizona's jurisdictional statute, are discussed in the Arizona Criminal Code Commission Commentary (1975):

> The primary constitutional question for jurisdictional statutes involves the power of a state to legislate other than on a strict territorial basis. The following excerpt from the Michigan Revised Criminal Code (proposed), commentary to § 140 *summarizes the law:*
>> Unless the state constitution contains a provision limiting the power of the legislature to enact legislation with extraterritorial application, the Tenth Amendment to the United States Constitution and United States Supreme Court cases like *Skiriotes v. Florida*,

61 S.Ct. 924, 313 U.S. 69, 85 L.Ed. 1193 (1941), and *Strasheim [sic] v. Daily*, 31 S.Ct. 558, 221 U.S. 280, 55 L.Ed. 735 (1911), appear clearly to permit a state to exercise *any basis of legislative jurisdiction recognized in international law* unless (1) the actual application of state legislation conflicts with the paramount power of the federal government to regulate and conduct foreign relations, (2) the legislation covers an area that the Congress has preempted under one of the powers delegated to it, or (3) there is an impermissible conflict with the legislative policies of the other state or states in which the defendant's actual conduct took place.

*Id.* at 20 (emphasis added). Thus, the Code Commission recognized that the principles of international law circumscribe the state's criminal jurisdiction.

### INTERNATIONAL LAW APPLIED— THE RESULT THEORY

■ The state argues that, when out-of-state criminal conduct "results" in deprivation of personal property to an Arizona citizen, Arizona courts are vested with jurisdiction by virtue of A.R.S. § 13–108(A)(1). The state cites no case that has stretched jurisdiction to reach an offender, like Miller, who was not a resident, who never entered the state, and who had nothing to do with the theft until the initial taking of the victim's property was complete. The case we find most closely in point, *United States v. Columba–Colella*, 604 F.2d 356 (5th Cir.1979), is squarely contrary to the state's position.

In *Columba–Colella*, the defendant was a British citizen and resident of Mexico who had no apparent contact with the United States. He lived in a Mexican border town where he took possession of a car that he knew had been stolen in the United States. The defendant was convicted of receiving a stolen vehicle in foreign commerce, in violation of 18 U.S.C. § 2313. The United States Court of Appeals for the Fifth Circuit ruled that the courts of the United States had no jurisdiction over the

offense because the defendant's knowledge that the car had been stolen in the United States and transported into Mexico arose after those acts were completed. When the defendant first learned those facts he was in Mexico, where all his contacts with the person who stole the car took place. The court concluded that the defendant's act of receiving and attempting to sell the stolen car was "no constituent element" of the principal thief's crime, "and [was] not made so by the coincidence that the property subject to their agreement belonged to a citizen of the jurisdiction in which the theft occurred." *Id.* at 359. The defendant's crime was "legally unrelated" to the prior theft. *Id.*

The *Columba–Colella* court suggested that, when criminal conduct has taken place wholly within a jurisdiction, its character must be determined by the law of the place where the act was done:

> It is difficult to distinguish the present case from one in which the defendant had attempted not to fence a stolen car but instead to pick the pockets of American tourists in Acapulco. No one would argue either that Congress would be competent to prohibit such conduct or that the courts of the United States would have jurisdiction to enforce such a prohibition were the offender in their control.

*Id.* at 360.

Recognizing the limitations on the power of Congress to punish crimes committed wholly outside the United States, the *Columba–Colella* court said, "We find that because the defendant's act in this case *is beyond its competence to prescribe,* Congress did not intend to assert jurisdiction here under 18 U.S.C. § 2313." *Id.* (emphasis added).

The result reached in *Columba–Colella* is consistent with international law as it is expressed in the *Restatement (Second) of the Law, Foreign Relations Law of the United States* (1965), in the tentative drafts of the proposed *Restatement (Third) of the Law, Foreign Relations Law of the United States,*[1] and in the *Model Penal Code* (1985). While we recognize that neither the *Restatements* nor the *Model Penal Code* control the reach of specific state legislation, they are indicative of what authorities in the field believe as to how far a state may extend its criminal jurisdiction.

The *Restatement (Second) of the Law of Foreign Relations of the United States* § 30(2) reads as follows:

> § 30. Jurisdiction to Prescribe with Respect to Nationals
>
> . . . .
>
> (2) A state does not have jurisdiction to prescribe a rule of law attaching legal consequences to conduct of an alien outside its territory merely on the ground that the conduct affects one of its nationals.

Comment (e) to § 30 explains that subsection (2)

> rejects the so-called 'passive personality' principle under which a number of [nations] assert that they may prescribe rules governing the criminal conduct of aliens outside their territory if the victims of the crime are their nationals.

Thus, something more than an effect on one of its citizens is usually required for a country or state to assert jurisdiction over a person whose criminal act committed in another country or state affects one of its citizen's interest. Section 402 of the proposed *Restatement (Revised) of the Law, Foreign Relations Law of the United States,* however, does expand jurisdiction to allow a state to reach those whose crimes have a substantial effect within the state:

> Subject to § 403, a state has jurisdiction to prescribe law with respect to
>
> . . . .
>
> (c) conduct outside its territory which *has or is intended to have substantial*

---

1. The *Restatement (Third) of the Law, Foreign Relations Law of the United States* has not yet been published. Its proposed text is now found in various tentative drafts entitled *Restatement (Revised) of the Law, Foreign Relations Law of the United States.*

*effect* within its territory[.] [2] *Restatement (Revised) of the Law, Foreign Relations Law of the United States,* § 402(1)(c) (Tent.Draft No. 6, 1985) (emphasis added). The state's "result" theory and the *Restatement's* reference to "substantial effect" are directly related. Both address the same concept. The difference, as the state defines "result," is one of degree. The "result" of activity outside Arizona's jurisdiction must, at a minimum, however, have a "substantial effect" within Arizona.

As a guide to what constitutes a "substantial" in-state effect we look to *Strassheim v. Daily,* 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), an early case dealing with the exercise of extraterritorial jurisdiction. The Arizona Criminal Code Commission cited *Strassheim* as a basis for the exercise of extraterritorial jurisdiction. Arizona Criminal Code Commission Commentary at 20.

In *Strassheim,* a defendant named Daily had been indicted in Michigan for bribery and false pretenses. He had committed the offenses while in Illinois as part of a scheme to sell the State of Michigan used machinery that he said was new. In finding that Daily was subject to the jurisdiction of Michigan, Justice Holmes said:

> If a jury should believe the evidence, and find that Daily did the acts that led Armstrong to betray his trust, deceived the board of control, and induced by fraud the payment by the state, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the state until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as ·if he had been present at the effect, if the state should succeed in getting him within its power.

*Id.* at 284, 31 S.Ct. at 560, 55 L.Ed. at 738.

■ Many cases in addition to *Strassheim* discuss the extraterritorial reach of state criminal jurisdiction. They all involve more substantial contact than occurred here. *See, e.g., State v. Winckler,* 260 N.W.2d 356 (S.D.1977) (firing shots from outside a state's jurisdiction at individuals within the state without hitting them constitutes assault within the state); and *Hanks v. State,* 13 Tex.App. 289 (1882) (forging a certificate of land transfer for land within the state is within the jurisdiction of the state even though the forger never comes within the boundaries of the state.) What cases like *Strassheim, Winckler,* and *Hanks* share in common is criminal activity occurring outside a state's jurisdiction that does or is intended to do future direct harm within the state. Miller is not subject to the jurisdiction of the Arizona courts under a "result" theory because he is not an Arizona resident, all of his conduct occurred outside Arizona, and the conduct had, at most, only an insubstantial and indirect effect in Arizona. The "result"—the harm to the Arizona victim— had already occurred before Miller had any connection with the stolen property.

Finally, under § 1.03(1)(a) of the *Model Penal Code,* which we mentioned above as a third authority that is consistent with the rationale of *Columba–Colella,* Arizona would not have jurisdiction to punish Miller. Section 1.03(1)(a) reads:

> (1) ... [A] person may be convicted under the law of this State of an offense committed by his own conduct or the conduct of another for which he is legally accountable if: ,
>
> (a) either the conduct is an element of the offense or the *result* that is such an *element* occurs within this State ... (Emphasis added.)

Our statute, A.R.S. § 13–108(A)(1), mirrors the *Model Penal Code* language, *see Model Penal Code* § 1.03 n. 12, except that Arizona attempts to maximize the reach of

---

**2.** Section 403 of the Tentative Draft lists factors to be considered in determining whether an exercise of extraterritorial jurisdiction is reasonable. Under the *Restatement (Revised)* there may be an exercise of jurisdiction only when the act has a substantial effect *and when the* *exercise of jurisdiction is reasonable.* Since we find that Miller's act had no substantial effect in Arizona we need not measure Arizona's attempted exercise of jurisdiction against the factors listed in § 403.

its criminal jurisdiction by omitting the restriction that the result occurring within the state must be an element of the offense. This language in the *Model Penal Code* appears to equate with the *Restatement's* requirement that the criminal conduct have a substantial effect within the state. While we do not need to decide whether jurisdiction must be predicated on an element of the crime having occurred within the state, an effect more substantial than a continuing deprivation of property is required. Arizona must conform to international law in its exercise of extraterritorial jurisdiction.

### FAILURE TO PERFORM A DUTY

■ The state argues that A.R.S. § 13–1802(A)(4) imposes a duty on Miller to return the stolen property and that since he failed to do so, A.R.S. § 13–108(A)(4) extends jurisdiction to him because he has omitted the performance of "a duty imposed by the law of this state regardless of the location of the defendant at the time of the offense." *Id.* Section 13–108(A)(4) may, in some circumstances, reach persons outside the state who have failed to perform a duty imposed by Arizona law. The Arizona Criminal Code Commission Commentary suggests, as an example, a failure to pay child support ordered by an Arizona court. Arizona Criminal Code Commission Commentary at 21. There are, however, two problems with the state's argument, either of which is fatal to it.

Under A.R.S. § 13–1802(A)(4), a person commits theft if he knowingly misappropriates *lost, mislaid or misdelivered property* when the true owner could be notified. Those are not the facts of this case. While nothing in the indictment specifies which subsection of A.R.S. § 13–1802 Miller was charged under, Miller's offense is found under subsection (5) of the statute, which defines theft as the control of property of another knowing that it was stolen. The property here was not lost, mislaid or misdelivered so the duty to return it is simply not an element of Miller's offense.

The second problem with the state's "failure to perform a duty" argument is

that it is subject to the same analysis as is the state's "result" theory and thus succumbs to the rationale of *Columba–Colella*. We add that if the state were correct, i.e., if Miller had an ongoing duty to return the property such as would support Arizona's exercise of jurisdiction, then any and every state to which a theft victim might journey would have jurisdiction over a defendant who received personal property stolen from that victim. Criminal jurisdiction must rest on something more concrete, less transitory, and less provocative of interstate conflict and confusion than this.

### ACCOMPLICE THEORY

■ The state also suggests that the Arizona courts have jurisdiction over Miller under an accomplice theory, the basis for which is found in A.R.S. § 13–108(A)(1). The state argues as follows. The language of the theft statutes, A.R.S. §§ 13–1801 and 13–1802, is broad enough to criminalize the conduct of all knowing participants in the chain of a fencing operation. When Miller exercised control of the stolen rings, as well as aided in the sale of them, he became an accomplice to Farmer and Hart's theft. Further, since Farmer and Hart's conduct within Arizona was a violation of A.R.S. §§ 13–1801 and 13–1802 and was within the jurisdiction of the Arizona courts, Miller, as an accomplice, is liable for the principals' criminal acts. Therefore, the state's argument concludes, A.R.S. § 13–108(A)(1) confers jurisdiction over Miller as an accomplice. We disagree.

An accomplice is one who knowingly and with criminal intent participates, associates, or concurs with another in the commission of a crime. *State v. McNair*, 141 Ariz. 475, 480, 687 P.2d 1230, 1235 (1984). By receiving and selling the stolen rings Miller did not participate, associate or concur in the commission of Farmer and Hart's theft, because all of Miller's relevant conduct occurred after the theft that Farmer and Hart had committed was complete and after Farmer and Hart had left Arizona. Instead, Miller committed what would be a separate offense under Arizona law, if it had been committed in Arizona,

and is not liable as an accomplice for the earlier theft. *State v. Sims*, 99 Ariz. 302, 308–09, 409 P.2d 17, 21–22 (1966) *cert. denied* 384 U.S. 980, 86 S.Ct. 1880, 16 L.Ed.2d 691. In addition, the accomplice theory, like the "failure to perform a duty" theory, is intertwined with the "result" theory, and does not survive the *Columba–Colella* analysis.

### CONSPIRACY THEORY

The state's final argument is that the existence of a conspiracy gives Arizona courts jurisdiction over Miller under A.R.S. § 13–108(A)(2). However, the completion of a substantive crime that is the only purpose of a conspiracy signals the end of the conspiracy. *State v. Yslas*, 139 Ariz. 60, 64, 676 P.2d 1118, 1122 (1984). What Miller did is different from those situations "where conspirators make specific *pre-planned* efforts of escape, payment, concealment, or conversion of the fruits of the crime." *Id.* While Miller may be guilty of a conspiracy to commit theft (receiving stolen property) under subsection (5) of A.R.S. § 13–1802(A), it cannot be said that his agreement to possess and sell the jewelry was pre-planned as a part of a crime to be committed in Arizona. The result would be different if Miller's "intent [had] anticipated and embraced" Farmer and Hart's theft in Arizona. *Columba–Colella*, 604 F.2d at 359.

The judgment of the trial court is affirmed.

SHELLEY, P.J., and GRANT, J., concur.