COURT OF APPEALS OF VIRGINIA


Present:  Judges Fitzpatrick, Annunziata and Senior Judge Duff
Argued at Alexandria, Virginia


MICHAEL GEORGE KESELICA, S/K/A
 MICHAEL GEORGES KESELICA
                                              OPINION BY
v.   Record No. 1105-95-4          JUDGE CHARLES H. DUFF
                                         FEBRUARY 4, 1997
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                   Stanley P. Klein, Judge

         Richard S. Stolker for appellant.

         Kimberley A. Whittle, Assistant Attorney
         General (James S. Gilmore, III, Attorney
         General; Richard H. Rizk, Assistant Attorney
         General, on brief), for appellee.


     Michael George Keselica appeals his conviction for

embezzlement.  He contends that the trial court lacked subject

matter jurisdiction to try the case.  We disagree and affirm.

                              I.

     "On appeal, we review the evidence in the light most

favorable to the Commonwealth, granting to it all reasonable

inferences fairly deducible therefrom."  Martin v. Commonwealth,

4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

     So viewed, the evidence showed that Robert A. Winstead

resided in Fairfax County until December 4, 1993.  In 1989,

appellant was Winstead's "financial adviser, telling [him] which

stocks were available, and what stocks were a good buy."

Winstead testified that he and appellant "were good friends," and

that Winstead "even had [appellant] over to speak to [Winstead's]

Men's Brotherhood at [Winstead's] church." Appellant "would call [Winstead at his home], by phone" and recommend stocks to buy. Winstead would agree to purchase shares over the phone. Appellant sent Winstead invoices requiring payment within seven days of placing an order. Pursuant to appellant's instructions, Winstead wrote out and mailed personal checks to appellant's residence in Gaithersburg, Maryland. From May 1990 until November 1990, per appellant's instructions, Winstead wrote ten checks made payable to First Montauk Securities. Winstead mailed the checks to appellant. Winstead never received "ownership certificates" for the stocks purchased, so he telephoned appellant and asked about them. Appellant told Winstead that the stocks were "in a street name." Although he was concerned about the absence of ownership certificates, Winstead continued to buy stocks from appellant; however, Winstead continued to ask about the certificates, and appellant continued to explain that "it was in a street name." It was not until June 1993 that appellant informed the Winsteads that he had misappropriated their money in order to support a cocaine addiction and discussed repayment.

In a letter dated February 18, 1994, appellant told Winstead that "[w]hen we first did business together when I was with Dean Witter I was not guilty of fraud, deceit and greed. I was your normal stockbroker and family man. However, several years later is when my life started going downhill because of my addiction to cocaine."

Elta Winstead, Robert's wife, testified that she also purchased stock from appellant between May 1990 and November 1990 for which she wrote four personal checks. Like her husband, she mailed personal checks to appellant believing that he would purchase stock with the funds.

During an interview with Detective Purvis Dawson, appellant confessed his wrongdoing and confirmed Winstead's account of events. In a handwritten statement provided to Dawson, appellant admitted that he advised Winstead "to purchase more Perpetual stock" in order to "convert the funds to [his] own use to purchase more coke." According to appellant, "[a]s [he] became more involved with the drug [he] found [him]self lying more and stealing more to feed [his] habit. [He] would continue to make interest payments to Mr. Winstead to give him the impression that [the] investments were doing well."

On appeal, appellant argues that he gained lawful possession of the Winsteads' money, and did not convert or form the intent to convert the funds until later, when he was in Maryland. Appellant contends that no elements of the offense were committed in Virginia, and that the trial court lacked subject matter jurisdiction to prosecute the case, thereby rendering his judgment of conviction void.

## II.

If any person wrongfully and fraudulently
use, dispose of, conceal or embezzle any
money, bill, note, check, order, draft, bond,
. . . or any other personal property,

tangible or intangible, which he shall have received for another or for his employer, principal, or bailor, or by virtue of his office, trust, or employment, or which shall have been entrusted or delivered to him by another . . . he shall be guilty of embezzlement. Embezzlement shall be deemed larceny and upon conviction thereof, the person shall be punished as provided in § 18.2-95 or § 18.2-96.

Code § 18.2-111.

Virginia's venue statute provides:
Prosecution for offenses committed wholly or in part without and made punishable within this Commonwealth may be in any county or city in which the offender is found or to which he is sent by any judge or court; and if any person commit larceny or embezzlement beyond the jurisdiction of this Commonwealth and bring the stolen property into the same he shall be liable to prosecution and punishment for larceny or embezzlement in any county or city into which he shall have taken the property as if the same had been solely committed therein; . . . provided, that if any person shall commit embezzlement within this Commonwealth he shall be liable as aforesaid or to prosecution and punishment for his offense in the county or city in which he was legally obligated to deliver the embezzled funds or property.

Code § 19.2-245.

"Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power." Strassheim v. Daily, 221 U.S. 280, 285 (1911). The concept enunciated by Justice Holmes in Strassheim, i.e., that a

4

state may punish someone for acts done outside its borders where the acts were intended to produce and actually produced detrimental effects within the state, has been termed the "Result Theory."  See State v. Miller, 755 P.2d 434, 437 (Ariz. 1988) (discussing four theories to determine whether Arizona had jurisdiction; one theory, based on international law, was termed the "Result Theory");[1] see also Herbert B. Chermside, Jr., Annotation, Where is Embezzlement Committed for Purposes of Territorial Jurisdiction or Venue, 80 A.L.R.3d 514 at § 7 (1977) (explaining that, in a proper case, territorial jurisdiction may be exercised by state in which accused was only constructively present at time of offense if the accused "put into operation an agency or force which does harm in another jurisdiction").

Virginia adopted the "Result Theory" in Travelers Health Ass'n v. Commonwealth, 188 Va. 877, 51 S.E.2d 263 (1949), aff'd, 339 U.S. 643 (1950).  In Travelers, the defendant company (Travelers) offered and sold "membership contracts" that were deemed securities.  The contracts/securities were offered solely through mail solicitations; however, Travelers failed to apply for the requisite securities permit.  To obtain a permit, a prospective seller had to execute a document agreeing that service could be effected on it through the Secretary of the

---

[1] The other theories included "Failure to Perform a Duty," "Accomplice Theory," and "Conspiracy Theory."  755 P.2d at 439-40.

Commonwealth. Travelers argued that because it conducted no business in Virginia and "transacted [its] entire business outside the state through the mails," Virginia had no jurisdiction to prosecute the company for securities violations in Virginia. Id. at 884, 51 S.E.2d at 265.

The Supreme Court phrased the issue as whether "the Commonwealth possess[es] the jurisdiction and power to deal with the commission of crimes of this nature within its borders and punish same, although the transactions are principally carried on from without the State through the United States mail." Id. at 891, 51 S.E.2d at 268. The Court established the following general rule:

> "A question often arises as to the jurisdiction of a crime where the accused, while in one state, sets in motion a force which operates in another state, as where a shot is fired at a person across a state line or an injurious substance is sent to a person in another state with the intent to injure him. In such cases the view has generally been taken that actual presence in a state is not necessary to make a person amenable to its laws for a crime committed there; for if a crime is the immediate result of his act, he may be made to answer for it in its courts, although actually absent from the state at the time he does the act."

Id. (citation omitted).

In finding Travelers amenable to prosecution in Virginia, the Court explained: "'It has long been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when

6

he starts the train of events of which that evil is the fruit.'" Id. at 892, 51 S.E.2d at 269 (quoting United States v. Steinberg, 62 F.2d 77, 78 (2d Cir. 1932), cert. denied, 289 U.S. 229 (1933) (citing, inter alia, Strassheim, 221 U.S. at 284, 285)). The Court added that there are "[a]dditional authorities to the effect that a person may be guilty of crime by reason of the use of the mails, and that the crime is deemed to be committed in the State where the mail is received and the prohibited results occur." Id. at 892, 51 S.E.2d at 269.

In Gregory v. Commonwealth, 5 Va. App. 89, 360 S.E.2d 858 (1987), the defendant was convicted of fraudulent removal and conversion of a tractor and trailer in violation of Code § 18.2-115 (fraudulent conversion). Gregory, a resident of Botetourt County, Virginia, had earlier pledged the tractor and trailer to a Botetourt County bank as security for a loan. Gregory, 5 Va. App. at 90, 360 S.E.2d at 859. Pursuant to the loan, Gregory agreed that he would not sell the rig without the bank's consent. Id. at 90-91, 360 S.E.2d at 859. Gregory later admitted that he sold the tractor in Louisiana without the bank's consent. Id.

Gregory contended that the Virginia circuit court lacked jurisdiction because the alleged criminal acts did not occur in Virginia. He also asserted that his criminal intent was not formed until after he removed the vehicle from Virginia. The trial court agreed that Gregory did not form the "intent to

7

convert the secured property [until] after he removed it from Virginia," yet it found Gregory guilty. Id. at 92, 360 S.E.2d at 860. We affirmed the conviction and held that "nothing in the language of [Code § 18.2-115] requires proof that the fraudulent intent to dispose or the actual disposal of the secured property occurred within the boundaries of Virginia." Id. at 93, 360 S.E.2d at 860. Applying the result theory, we concluded that "[w]here harm is caused in Virginia by criminal acts partially committed within this Commonwealth, such acts can be prosecuted here." Id. at 94, 360 S.E.2d at 861 (quoting from Travelers, 188 Va. at 892, 51 S.E.2d at 269, that "'a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events'"). See also Foster-Zahid v. Commonwealth, 23 Va. App. 430, 440-41, 477 S.E.2d 759, 764 (1996) (finding that Virginia court had jurisdiction to prosecute out-of-state parent for parental abduction where Virginia parent delivered child to defendant out-of-state and defendant failed to return child to Virginia).

Here, the facts showed that while appellant was in Maryland, he used the telephone and the mails in a continuing scheme to solicit funds from the Winsteads for the sole purpose of diverting their funds to his own use. Appellant purposely lied about the absence of stock certificates and made sham interest payments in order to continue his embezzlement scheme and inflict further harm on the Winsteads in Virginia.

8

The record established that appellant, while located in Maryland, set in motion a scheme intended to produce and which did produce immediate detrimental effects in Virginia, namely, the fraudulent taking of money from Virginia residents and its attendant conversion to his own use. Appellant used the mails and telephone system to produce the intended detrimental effects.

Appellant's reliance on Moreno v. Baskerville, 249 Va. 16, 452 S.E.2d 653 (1995), is misplaced. In that case, Moreno sold drugs to a man named Moore in Arizona, who transported the drugs to Virginia. Unbeknownst to Moreno, Moore sold them to two men in Virginia. Id. at 17-18, 452 S.E.2d at 654. The Supreme Court held that Virginia courts had no jurisdiction to hear the case and reversed the convictions.

Applying a proximate cause analysis, the Court stated that "[t]he act of distribution by Moore to [Virginia buyers] intervened. The situation here is entirely unlike a case in which a shot fired across a state line 'immediately' results in harm, thus enabling the forum state to exercise extraterritorial jurisdiction over the assailant." Id. at 19-20, 452 S.E.2d at 655. Despite its finding that Moreno's acts did not cause the immediate result in Virginia, the Supreme Court reaffirmed the rule of law in Virginia

> that actual physical presence in a state is
> not necessary to make an individual amenable
> to its criminal laws if the crime is the
> "immediate result" of the accused's act;
> [and] under such circumstances, the accused
> may be tried in the state's courts even

9

> though actually absent at the time the act
> was committed.

Id. at 19, 452 S.E.2d at 655.

Here, appellant's acts caused the immediate and intended result or harm, and no intervening acts broke the causal chain he set in motion.  Therefore, Moreno is distinguishable from and inapplicable to the facts of this case.  Because appellant set in motion a criminal scheme, the immediate result of which caused

the intended harm in this state, Virginia had jurisdiction to try the case. Accordingly, appellant's conviction is valid and is affirmed.

<u>Affirmed.</u>

11