892 P.2d 1319

**STATE of Arizona, Appellee,**

v.

**Daniel Hayden WILLOUGHBY,
Appellant.**

No. CR–92–0439–AP.

Supreme Court of Arizona,
En Banc.

March 23, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Phoenix, for State.

John W. Rood, III, Phoenix, for Daniel Hayden Willoughby.

## OPINION

FELDMAN, Chief Justice.

On May 19, 1992, a Maricopa County jury convicted Daniel Hayden Willoughby (Defendant) of premeditated first-degree murder and conspiracy to commit murder, fraudulent schemes and artifices, armed robbery, ob-

structing a criminal investigation, and filing a fraudulent insurance claim. The court sentenced him to death for the murder conviction and to life in prison for the conspiracy offenses. Appeal of the judgment and sentence is automatic. Ariz.R.Crim.P. 26.15 and 31.2(b). This court has jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and 13–4033(A).

## FACTS AND PROCEDURAL HISTORY

Defendant and his wife, Trish, were residents of Phoenix, Arizona. In late 1990, Defendant arranged a trip to Puerto Peñasco (Rocky Point), Mexico, ostensibly as a Christmas gift for Trish. The couple and their three children rented a condominium at Las Conchas beach for a weekend in February 1991. The day after the family arrived, Defendant and the children went to visit a nearby museum. Trish stayed behind because she was tired and wanted to rest.

After Defendant and the children boarded their van for the museum, Defendant returned to the condo, saying he forgot his passport. He remained in the condo for about five minutes. While he was inside, his oldest daughter tried to enter, but the door was locked. When Defendant came out of the condo, he was adjusting his belt and tucking in his shirt. After Defendant returned to the van, he and the children went on their trip.

When they returned some two hours later, Defendant's ten-year-old daughter Thera rushed in to tell her mother about the trip. She found her mother unconscious in the bedroom. Trish had been stabbed, bludgeoned, and strangled, and a knife was protruding from her head. Defendant gathered the children outside for prayer and then drove to the Red Cross station for help. Trish died that evening.

Mexican authorities questioned Defendant, who told them that he and his wife were happily married. They eventually released Defendant, and he arranged for the return of Trish's body to Arizona for burial. No autopsy was performed until Arizona authorities exhumed the body several months later.

After the murder, Defendant's mother-in-law told several people, including an investigator from the Arizona Attorney General's Office, that Defendant might have committed the murder. This prompted an investigation which revealed that, although he had appeared happily married, Defendant had been unhappy with his wife for the past several years.

Investigators discovered that in late 1990, Defendant met Ysenia Patino Gonzalez, a Mexican transsexual who was then "married" to Jack Mielke. After the purported marriage ceremony between Ysenia and Mielke, Mielke paid for Ysenia to have a male-to-female sex change operation. At all relevant times, Ysenia was a resident alien living in Arizona.

Defendant began an affair with Ysenia, took her on vacations, and paid the rent for her apartment. Trish eventually learned of the affair and confronted Ysenia. Defendant moved Ysenia to a different apartment. He also bought her an expensive engagement ring and told others, including Jack Mielke, that he wanted to marry Ysenia. He told Ysenia, however, that he could not divorce his wife because she "had too much on him."

Defendant, in fact, depended on Trish's income. She and her mother were sole partners in a business worth over $2.5 million, with a 1990 income of $324,000. Defendant, meanwhile, had lost his job, and he told Ysenia he would be "taken to the cleaners" if he tried to divorce Trish.

Defendant began to talk about killing his wife. Ysenia testified at trial that at various times Defendant discussed buying a firearm silencer in Mexico, drowning Trish while scuba diving, or pushing her off a cliff at the Grand Canyon. In May 1990, during a dinner with Ysenia and Jack Mielke at a Tempe restaurant, Defendant said, "I think I will take her to Mexico and get rid of her." He later made similar statements to them at a restaurant in Cottonwood, Arizona. He also discussed having his "Mafia connections" kill her.

Defendant began discussing with Trish and her mother the disposition of their business should one of them die. He eventually con-

vinced them to adopt an insurance-funded buyout agreement. Several insurance policies covered Trish, including a $750,000 policy purchased just months before her murder.

Defendant began to plan the murder in more detail. He told Ysenia that he wanted the satisfaction of killing Trish. Ysenia was instructed to come in after the killing and make it look like a robbery by stabbing Trish, strangling her with a rope he bought, ransacking the condo, and taking her rings and money. Defendant rented a condo in Rocky Point, somewhat removed from others in the area, and paid in cash. Defendant and Ysenia made two trips from Phoenix to Rocky Point before the killing to reconnoiter the area and go over their plans. In Phoenix, Defendant showed Ysenia a weapon, described as a homemade mace consisting of a heavy ball attached by rope to a handle, he would use to kill Trish. He arranged for Ysenia's brother to take Ysenia to Rocky Point on the day of the murder.

On the afternoon of the killing, Defendant met Ysenia and her brother on the beach at Rocky Point. After Defendant and Ysenia talked, Defendant returned to the condo. Ysenia left her brother at a park and drove to a spot with a view of the condo. After Defendant and the children left for the museum, she went to the condo and entered through the unlocked back door. Taking knives from the kitchen, Ysenia went to the bedroom and saw Trish lying comatose in a pool of blood. Trish was still breathing, each breath making a gurgling sound. Following Defendant's plan, Ysenia stabbed and strangled Trish but was unable to kill her. After taking Trish's rings and money and scattering the contents of Trish's purse, Ysenia fled, meeting her brother for the return trip to Arizona.

At the border, a United States Customs agent understood Ysenia to say that she and her brother were going to a store just across the border. When the agent saw that they did not go there, she had them returned to the port of entry and searched. Trish's rings were discovered in Ysenia's pocket, but because no contraband was discovered, Ysenia and her brother were released. They immediately returned to Phoenix.

After the murder, Defendant took steps to cover his tracks. He told Ysenia to leave Phoenix, and she returned to Mexico. Defendant called a meeting of his neighbors, at which he denied involvement in the killing and tried to dissuade them from talking to police. He asked Ysenia's brother to lie to police about seeing Defendant in Mexico. He threatened Jack Mielke and told him not to get involved. He called his travel agent to have the trip information removed from the agent's computer. He asked his former secretary to tell police he was a wonderful family man and told her to threaten a co-worker to prevent him from telling police about Defendant and Ysenia. He lied to investigators, saying that guards at the condo had seen three Indians in a black pickup truck in the area. He collected on an older life insurance policy for his wife but was unsuccessful in collecting on the policy purchased to fund the buyout agreement between Trish and her mother.

A Maricopa County grand jury indicted Defendant for premeditated first-degree murder and conspiracy to commit one or more of the following offenses: murder, fraudulent schemes and artifices, armed robbery, obstructing a criminal investigation or prosecution, and filing a fraudulent insurance claim. Ysenia was charged with murder by the Mexican authorities, pleaded guilty, and was sentenced to life in prison. During the investigation, the Mexican government cooperated with Arizona officials by allowing them to interview Ysenia and giving them temporary custody of her so that she could testify at the three-week trial. In return for turning state's evidence, the state agreed to not prosecute Ysenia and to try to have her sentence in Mexico reduced.

The defense called no witnesses and rested immediately after the state's case concluded. The jury convicted Defendant of both the murder and conspiracy counts. After the aggravation/mitigation hearing, the trial judge found one aggravating circumstance—that the murder was committed in expectation of pecuniary gain—and no mitigating circumstances. He sentenced Defendant to death for the murder and life imprisonment for the conspiracy conviction.

## JURISDICTION ISSUES

The fact that the fatal blow and the victim's death occurred in Mexico raises jurisdictional issues not present in the great majority of cases. The trial court asserted jurisdiction under A.R.S. § 13–108,[1] which gives Arizona extra-territorial jurisdiction under certain conditions, including cases in which a defendant commits an element of an offense within the state. The state invoked jurisdiction on the ground that Defendant had planned the crime in Arizona, premeditation being an element of the charges.

Before trial, Defendant challenged the constitutionality of A.R.S. § 13–108 and moved to dismiss the murder charge on the ground that Arizona lacked subject matter jurisdiction to try him for crimes committed in Mexico. The trial judge denied the motion. At the close of evidence, Defendant asked the trial judge to instruct the jury that it must decide beyond a reasonable doubt that an element of the crime was committed in Arizona. After hearing arguments on who decides the jurisdictional question and by what quantum of proof, the judge refused Defendant's request to instruct the jury on the jurisdictional issue, holding that the court would resolve the jurisdictional facts under a preponderance of the evidence standard.

On appeal, Defendant does not renew his argument that the jurisdictional question was for the jury. He does argue, however, that the evidence was insufficient to prove that essential elements of first-degree murder or conspiracy occurred in Arizona, that the court erred in finding jurisdiction, that the Arizona statute conferring jurisdiction is un-

constitutional, and that Arizona law cannot be applied because it conflicts with Mexican law, which has no death penalty. In essence, Defendant contends that because both Trish's death and the act directly causing it occurred in Mexico, there is neither a factual nor constitutional basis for Arizona's assertion of jurisdiction to try him or to impose the death penalty.

In the past, we have reviewed the facts of cases to decide whether the trial court properly exercised jurisdiction, but we have not provided any guidance to trial courts about how to resolve disputed factual issues necessary for exercising territorial jurisdiction. *E.g., State v. Poland,* 132 Ariz. 269, 275, 645 P.2d 784, 790 (1982), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986); *State v. Bussdieker,* 127 Ariz. 339, 341, 621 P.2d 26, 28 (1980). The need for guidance on who decides jurisdictional facts and by what standard is illustrated by cases such as this and *State v. Vaughn,* 163 Ariz. 200, 202, 786 P.2d 1051, 1053 (App.1989), which the court of appeals remanded, without discussing the appropriate standard of proof, to give the defendant an opportunity to prove at a post-trial hearing that the state did not have jurisdiction. The facts and trial record of this case squarely raise the issue of who properly resolves jurisdictional facts in a criminal case and by what standard. Because Defendant's right to a jury trial may have been violated, raising the possibility of fundamental error, and because our previous decisions provide no guidance, we address this issue before considering the merits of Defendant's other arguments.[2]

---

1. A.R.S. § 13–108(A) provides in relevant part:

 A. This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which such person is legally accountable if:
 1. Conduct constituting any element of the offense or a result of such conduct occurs within this state; or

 . . . . .

 3. The conduct within this state constitutes an attempt, solicitation, conspiracy or facilitation to commit or establishes criminal accountability for the commission of an offense in another jurisdiction that is also an offense under the law of this state. . . .

2. We emphasize that the question was not first raised by this court. It was raised and argued in the trial court. The concurring opinion argues that because this issue was not raised on appeal, we should not decide it. We disagree. Until we determine whether the judge or jury decides jurisdictional facts, we cannot decide whether the trial judge committed error or fundamental error in appropriating the jurisdictional question. Thus, fundamental error doctrine requires us to reach this issue. Moreover, experience teaches that the issue eventually will be decided in this case—if not now, then in post-conviction proceedings. We see no purpose in delaying the inevitable. Our present consideration of the issue, therefore, is also motivated by concerns for finality and efficiency.

## A. Jurisdictional decisions in Arizona

Under A.R.S. § 13–108(A)(1), Arizona has jurisdiction to try a defendant if conduct constituting one or more elements of the charged offenses occurred in Arizona. According to § 13–1105(A)(1), a "person commits first degree murder if . . . [i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation. . . ." A.R.S. § 13–1101(1) defines premeditation to mean "that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection." To invoke jurisdiction in this case, the state sought to prove that Defendant committed premeditation in Arizona.

In the usual case, there is no question but that the crime charged was committed entirely in Arizona. In this unusual case, Defendant is charged with an offense only part of which is alleged to have taken place in Arizona: the fatal blow and the death occurred in Mexico, and only acts of preparation allegedly took place in Arizona. To prosecute and convict Defendant for first-degree murder in Arizona, the state had to prove that acts of premeditation were committed in Arizona.[3] A.R.S. § 13–108(A). Thus, the jurisdictional facts appear to be intertwined with the substantive facts and might not be capable of separate resolution: to convict, the state had to prove premeditation, and to exercise jurisdiction, the state had to prove that if premeditation occurred, it took place in Arizona.

### 1. The identity of the factfinder and the standard of proof

If jurisdictional facts are intertwined with the merits of the case, the jurisdictional and substantive issues are difficult to resolve separately *only if the jurisdictional facts are controverted by evidence.* In the civil arena, we addressed the issue in Bonner v. Minico, Inc., 159 Ariz. 246, 253–54, 766 P.2d 598, 605–

06 (1988), and followed the approach of the United States Supreme Court in *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 1011, 91 L.Ed. 1209 (1947) (trial court generally has the authority to decide jurisdiction; if jurisdictional facts are controverted and intertwined with the merits, they must be left to the trier of fact). Although the court itself cannot resolve the substantive issue by resolving disputed jurisdictional facts, the "jurisdictional factual issues, like other factual issues, remain subject to the usual rules of summary judgment." *Bonner,* 159 Ariz. at 254, 766 P.2d at 606.

Although summary judgment procedure as such is not available in criminal cases, if factual questions unrelated to the elements of an offense are not disputed, courts do not submit them to the jury. *E.g., State v. Wood,* 180 Ariz. 53, 65, 881 P.2d 1158, 1170 (1994) (lesser-included offense instruction not required if not supported by the evidence). The jury's role, as guaranteed by our state and federal constitutions, is to decide the factual issues of a defendant's guilt or innocence. *State v. Bible,* 175 Ariz. 549, 567, 858 P.2d 1152, 1170 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). The issue then is this: if jurisdictional facts are controverted and their resolution intertwined with proof of elements of the crime, who should resolve the factual question of jurisdiction—judge or jury—and by what standard?

█ In the absence of controlling federal authority, states are of course free to determine their own rules for resolving jurisdictional facts in criminal cases. Our legislature has not addressed this matter.[4] We have not decided it and look, therefore, to other authority for guidance. Most states have held that if the facts on which jurisdiction depends are controverted, resolution of those disputed facts must be left to the jury. *Sheeran v. State,* 526 A.2d 886, 890 (Del.1987); *Lane v. State,* 388 So.2d 1022, 1028 (Fla.1980); *Conrad v. Indiana,* 262 Ind. 446, 317 N.E.2d 789, 792 (1974); *State v. Liggins,* 524 N.W.2d 181,

---

3. The state did not charge Defendant with felony murder, no doubt because none of the elements of the underlying felony occurred in Arizona.

4. The legislative record for the enactment of A.R.S. § 13–108 offers no guidance on court procedures for deciding questions of jurisdiction.

184 (Iowa 1994); *State v. Batdorf,* 293 N.C. 486, 238 S.E.2d 497, 502–03 (1977) (reversing previous decisions and requiring the state to prove jurisdiction beyond a reasonable doubt, with proper jury instructions); *People v. McLaughlin,* 80 N.Y.2d 466, 591 N.Y.S.2d 966, 606 N.E.2d 1357, 1359–60 (1992); *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255, 258 (1973). Only two jurisdictions have expressly held that the issue is not for the jury but for the court. *Connecticut v. Beverly,* 224 Conn. 372, 618 A.2d 1335, 1339 (1993); *Mitchell v. United States,* 569 A.2d 177, 180 (D.C.App.) (the location of an offense is not a factual question for the jury), *cert. denied,* 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990). However, as one respected authority observed, the general rule is: "At least when the matter has been put into issue by the defendant, whether the prosecuting government actually has criminal jurisdiction over the conduct of the defendant is a matter to be determined by the trier of fact." 1 WAYNE R. LaFAVE & AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW § 2.7(b), at 163 (1986) (citations omitted) (hereinafter LaFAVE & SCOTT).[5]

Some courts actually treat jurisdiction like an element of the crime, at least when there is evidence controverting jurisdiction.[6] *E.g., Sheeran,* 526 A.2d at 890; *Lane,* 388 So.2d at 1028; Annotation, *Comment Note—Necessity of Proving Venue or Territorial Jurisdiction of Criminal Offense Beyond Reasonable Doubt,* 67 A.L.R.3D §§ 10–12 (1975 and Supp. 1994). In those states, the prosecution must prove beyond a reasonable doubt that an element of the crime occurred in the state for the state to exercise its jurisdiction. *E.g., State v. Ross,* 230 Conn. 183, 646 A.2d 1318, 1331 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1133, 130 L.Ed.2d 1095 (1995); *Lane,* 388 So.2d at 1028; *McLaughlin,* 591 N.Y.S.2d at 969 n. *, 606 N.E.2d at 1360 n. * (citing 22 jurisdictions holding that proof of territorial jurisdiction must be proven beyond a reasonable doubt and two that have adopted the proof by a preponderance standard). The Florida Supreme Court reasoned that broad jurisdiction conferred by a statute like A.R.S. § 13–108 requires the highest level of proof. *Lane,* 388 So.2d at 1028.

■ Even when jurisdictional facts are not contested by controverting evidence and are decided by the trial judge, in some jurisdictions the judge must decide those facts beyond a reasonable doubt. *Mitchell,* 569 A.2d at 180. A lesser standard has been allowed in cases in which the question of territorial jurisdiction is identified with the issue of venue.[7] *See, e.g., Cauley v. United States,*

---

5. The concurrence takes the minority view, concluding that jurisdiction is always a question of law for the court. The concurrence fails to take into account those rare cases addressed by our rule where controverted jurisdictional facts cannot be resolved without reaching the merits of the case. The rule we adopt is no different than that applied in *Bonner* where our civil courts are prohibited from deciding controverted jurisdictional facts when they are intertwined with the substantive issues in the case.

The procedure is analogous to instructing the jury on facts pertaining to probable cause in a malicious prosecution or false arrest case. Probable cause is a legal issue for the judge, but where there is conflicting probable cause evidence, the jury must decide the facts and the judge instructs on the law as to what constitutes probable cause. *Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 419, 758 P.2d 1313, 1321 (1988) ("the court may instruct the jury hypothetically, telling them what facts will constitute probable cause."); *Sarwark Motor Sales, Inc. v. Woolridge,* 88 Ariz. 173, 177–78, 354 P.2d 34, 36–37 (1960) (setting forth two methods of instructing the jury); *see also* W. PAGE KEETON ET AL, PROSSER AND KEETON ON THE LAW OF TORTS § 119, at

882 (5th ed. 1984) (judge can either require special verdict or instruct on what facts, if found, would constitute probable cause).

6. We suspect the reason for this is simply because in almost every case in which the issue is raised, as in the present case, proof of the facts essential to establishing jurisdiction is inextricably intertwined with proof of an element of the crime.

7. At trial, the prosecutor persuaded the judge that jurisdiction was an issue for the court by citing Arizona venue cases. *E.g., State v. Mohr,* 150 Ariz. 564, 566, 724 P.2d 1233, 1235 (App. 1986). The two concepts are different in very important ways. Venue is a question of whether the trial court exercises jurisdiction in the proper locality. By art. 2, § 24, the Arizona Constitution requires that the court's jurisdiction be invoked in the county where the crime occurred, but such venue may be waived or changed. *State v. Girdler,* 138 Ariz. 482, 490, 675 P.2d 1301, 1309 (1983), *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 826 (1984); *see also Lane,* 388 So.2d at 1026. Subject matter jurisdiction, on the other hand, may not be waived or

355 F.2d 175 (5th Cir.), *cert. denied*, 384 U.S. 951, 86 S.Ct. 1572, 16 L.Ed.2d 548 (1966). Only one state court has adopted a preponderance standard for deciding whether the state has territorial jurisdiction. *People v. Cavanaugh*, 44 Cal.2d 252, 282 P.2d 53, 59 (1955) (approving jury instruction that proof of territorial jurisdiction could be established by a preponderance of the evidence), *cert. denied*, 350 U.S. 950, 76 S.Ct. 325, 76 S.Ct. 325 (1956); *see also* Utah Code 1953 § 76–1–501(3) (Michie 1994) ("The existence of jurisdiction and venue are not elements of the offense but shall be established by a preponderance of the evidence.").

In drafting the Model Penal Code (MPC), the textual basis for much of Arizona's criminal code, the American Law Institute (ALI) broadly defined jurisdiction as an element of an offense. MPC § 1.13(9)(e). The ALI recommends, therefore, that jurisdiction be proved beyond a reasonable doubt. MPC § 1.12(1) cmt. at 188–89; *see also Liggins*, 524 N.W.2d at 184 (citing cases); *McLaughlin*, 591 N.Y.S.2d at 969 n. *, 606 N.E.2d at 1360 n. *; LaFave & Scott § 2.7(b), at 163. Although our legislature adopted many sections of the MPC, it did not advert to this jurisdictional provision. Thus, we are not required to follow the ALI's recommended procedure for deciding jurisdiction.

■ Nevertheless, we believe the position taken by the ALI and the vast majority of states is, for the most part, a good rule: jurisdictional facts must be established beyond a reasonable doubt in all cases in which jurisdictional facts are questioned. *See, e.g., Sheeran*, 526 A.2d at 890; *Lane*, 388 So.2d at 1029; *Liggins*, 524 N.W.2d at 184; *McLaughlin*, 591 N.Y.S.2d at 969 n. *, 606 N.E.2d at 1360 n. *; *see also* Annotation, 67 A.L.R.3D § 10, at 988. The view requiring the lesser standard, espoused by the concurrence, is not only a distinct minority view but cannot be logically applied to cases such as this. It simply makes no sense in a single

trial to require the factfinder to determine the existence of facts on the reasonable doubt standard for guilt purposes and the same facts on the preponderance standard for jurisdiction purposes. Thus, beyond simply being the majority rule, the view requiring the higher quantum of proof has much to commend it:

> Even if [the highest standard of proof] is not compelled under *In re Winship*[8] because jurisdiction is not one of "those facts essential to establishing criminality of the defendant's conduct," it is nonetheless sound. Use of the beyond a reasonable doubt standard minimizes the possibility that a defendant will be tried in one state for a crime actually committed elsewhere. Moreover, it makes it more likely that other states will afford full faith and credit to decisions regarding criminal jurisdiction, even though they are not constitutionally required to do so. There is also the practical consideration that using a lesser standard for a portion of the prosecution's case and the beyond a reasonable doubt standard for the rest would doubtless create confusion in the minds of jurors.

LaFave & Scott § 2.7(b), at 163 (citations omitted). We agree with this reasoning and the position taken by most courts. In the very rare case in which jurisdiction is legitimately in issue because of contradicting jurisdictional facts, Arizona's territorial jurisdiction must be established beyond a reasonable doubt by the jury.

■ We do not, however, equate jurisdiction with elements of the offense, although some states have treated it as such. If the jurisdictional facts are undisputed, as in almost all cases, the court may decide the issue. *See Graham v. State*, 34 Ark.App. 126, 806 S.W.2d 32, 34 (1991) (state not required to prove jurisdiction absent evidence affirmatively showing court may lack jurisdiction); *Liggins*, 524 N.W.2d at 184; *Bighum*, 307 A.2d at 258–59. In the absence of

changed. *State v. Avila*, 147 Ariz. 330, 334, 710 P.2d 440, 443 (1985); *State v. Baldwin*, 305 A.2d 555, 559 (Me.1973). Venue and sovereign jurisdiction therefore are governed by different policy considerations. *Lane*, 388 So.2d at 1026; *see Liggins*, 524 N.W.2d at 184 (territorial jurisdiction treated

as an essential element of an offense; venue is a nonjurisdictional issue); *Baldwin*, 305 A.2d at 558.

8. 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

evidence contradicting jurisdiction, then, only the issues pertaining to criminality must go to the jury. LaFave & Scott § 2.7(b), at 163.

### 2. Did the evidence raise any issue whether conduct constituting an element of the crime occurred in Arizona?

Normally, the question of where premeditation occurred would be irrelevant. But because the fatal blow and death occurred outside of Arizona, in order to exercise jurisdiction and try Defendant for premeditated first-degree murder the state had to establish both that premeditation occurred and that it occurred in Arizona. Consequently, a substantive issue of this case was inextricably bound with the jurisdictional issue. However, that fact alone is not sufficient to require the jury to resolve the jurisdictional question. If there is no evidence that the acts of premeditation alleged by the state might have taken place outside Arizona, then there is no material dispute about where premeditation occurred and no requirement to send the question of jurisdiction to the jury. We thus look to see whether there was any jurisdictional dispute to be resolved by the jury.

Premeditation is established by evidence of a plan to murder formed after deliberation and reflection. *State v. Tostado,* 111 Ariz. 98, 101, 523 P.2d 795, 798 (1974). Thus, if the murder scheme was hatched in Arizona, Arizona can assert jurisdiction. *Id.* Other states with similar statutes have taken the same approach. *Lane,* 388 So.2d at 1027–28 (evidence of premeditation or a predicate felony for conspiracy in Florida confers jurisdiction to try defendant although fatal blow and death occurred in Alabama); *Conrad,* 317 N.E.2d at 791–92 (jury properly instructed that it must find killing in Ohio was intended and planned in Indiana to convict defendant in Indiana).

In the present case, there was substantial evidence of deliberation and reflection—a considered, planned agreement to kill. Testimony from Ysenia, her brother, Jack Mielke, and other witnesses showed that much of the planning took place in Arizona. For example, during a conversation between Defendant and Ysenia in Chandler, Defendant explained the plan to Ysenia in detail. Defendant's Arizona acts included discussing with Ysenia where, when, and by what means he would kill his wife; securing Ysenia's cooperation in making the murder look like a robbery; arranging with a Phoenix vacation rental agency to rent a condo in Rocky Point for the murder; obtaining his mother-in-law's cooperation to ensure that his wife would be free from business responsibilities on the weekend of the planned murder; arranging with Ysenia's brother to drive her to Rocky Point; and showing the murder weapon to Ysenia. After the killing, Defendant followed through with his plan to cover his tracks and collect the insurance money.

Nor was proof of the scheme entirely dependent on Ysenia's challenged testimony. There were other, unimpeached witnesses who heard Defendant plotting. There was, for example, the evidence from Ysenia's brother, Jack Mielke, travel agents, insurance agents, and others. Certainly, these facts are sufficient evidence of premeditation to establish Arizona's jurisdiction under § 13–108(A)(1).

There was no controverting evidence on the jurisdictional issue. Although Defendant argued about the interpretation of his conduct, claiming the discussions were only hypothetical and not actual planning for a real murder, he did not dispute the location of these discussions. He argued that merely discussing the desire to kill his wife did not prove that he actually planned to follow through. He points out, for instance, that at various times he discussed pushing Trish off a cliff, drowning her, purchasing a firearms silencer in Mexico, and arranging a Mafia hit. He does not argue that these discussions occurred outside Arizona; instead he claims they did not show a real intent to commit the murder as it actually occurred. The state, however, showed that at least one of the methods discussed—bludgeoning with a homemade mace followed by Ysenia's attack—was consistent with the forensic and other evidence of Trish's death. There is no evidence indicating that the final plan to kill was discussed anywhere else but in Arizona.

We conclude, therefore, that all of the evidence establishes, beyond doubt, that if an actual murder was planned, the plan was hatched in Arizona and brought to fruition in Mexico. The jury verdict on both the murder and conspiracy counts settled any question of whether the plan formulated was real. The evidence raised no question about where it was formulated. Premeditation being "part of the corpus delicti" of premeditated first-degree murder, *Poland*, 132 Ariz. at 276, 645 P.2d at 791, and the verdict having established that actual premeditation occurred, there was no question but that it occurred in Arizona.

■ Based on the foregoing, we conclude that the trial judge was not required to send the question of jurisdiction to the jury. We note that in taking the issue of jurisdiction from the jury, the trial judge applied the preponderance of evidence standard to determine whether the facts supported the state's authority to prosecute this case. Although this is an incorrect statement of the state's burden to establish sovereign jurisdiction, the error is harmless on this record because the evidence established beyond any doubt that an element of the charged offense was committed in Arizona, and there was no evidence to the contrary.

Therefore, we find that there was no error, fundamental or otherwise, in refusing Defendant's request to instruct the jury on the jurisdictional prerequisites and only harmless error in the judge's statement that he found jurisdiction by a preponderance. Thus, we hold that the state had power to try Defendant for the murder committed in Mexico.

### 3. *Was there sufficient evidence of conduct in Arizona to support jurisdiction to prosecute for conspiracy?*

Defendant was also charged with conspiracy to commit any or all of the following: murder, fraudulent schemes and artifices, armed robbery, obstructing a criminal investigation or prosecution, and filing a fraudulent insurance claim. Jurisdiction on these counts was predicated on A.R.S. § 13–108(A)(3). *See supra* note 1.

Conspiracy is defined in A.R.S. § 13–1003(A):

A person commits conspiracy if, with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another. . . .

■ Although the elements of conspiracy are intent, an agreement, and, in some cases, an act in furtherance of a substantive offense, *State v. Newman*, 141 Ariz. 554, 559, 688 P.2d 180, 185 (1984), reviewing courts generally focus on the agreement element. *State v. Gessler*, 142 Ariz. 379, 383, 690 P.2d 98, 102 (App.1984). The agreement may be proven by circumstantial evidence. *State v. Avila*, 147 Ariz. 330, 336, 710 P.2d 440, 446 (1985).

■ Testimony amply demonstrated that a number of conversations in Arizona focused on a scheme to murder, perpetrate a fraud, commit armed robbery, obstruct a criminal investigation, and receive insurance money. In addition to those facts already mentioned, Defendant's insistence that his wife and mother-in-law insure a buy-sell agreement for their business and Ysenia's bragging to others that she was "going to be a millionaire" indicated that an agreement for criminal conduct was made. On this count, as on the murder count, the guilty verdict defeats Defendant's claims that his discussions with Ysenia, Jack Mielke, Ysenia's brother, the travel agent, and others were no more than idle talk. The jury found beyond a reasonable doubt that Defendant and Ysenia actually planned the killing. Here, as on the murder count, the evidence is unquestioned that if a real agreement was reached, it was made in Arizona.

We hold, therefore, that the trial court had sovereign power to try Defendant for conspiracy. *See State v. Streater*, 233 N.J.Super. 537, 559 A.2d 473, 476–77 (Ct.1989) (New Jersey had jurisdiction to try conspiracy count even though acts constituting substan-

tive offense occurred solely in Connecticut), *review denied*, 117 N.J. 667, 569 A.2d 1358 (1989); *accord Commonwealth v. Kloss*, 253 Pa.Super. 559, 385 A.2d 480, 483 (1978).

**B. Is assertion of jurisdiction unreasonable and therefore in violation of principles of international law?**

██ Defendant also contends that Arizona's assertion of jurisdiction in this case violates an important principle of international law. Relying on the RESTATEMENT (THIRD) OF FOREIGN RELATION LAWS OF THE UNITED STATES § 402 cmt. k (1986) (hereinafter RESTATEMENT),[9] he argues that killing an American citizen in a foreign country does not have a sufficiently substantial result within the state to give the state jurisdiction to prosecute the homicide. Defendant claims that the effect in Mexico, on the other hand, is substantial, making Mexico the only sovereign with power to try Defendant.

Arizona's exercise of jurisdiction in this case is not, as Defendant assumes, based on the effect or results of the crime in Arizona. *Cf. State v. Miller*, 157 Ariz. 129, 755 P.2d 434 (App.1988). It is based instead on the evidence that elements of the charged offenses took place in Arizona. RESTATEMENT § 402(1)(a) expressly recognizes that a state may exercise its authority to regulate conduct that occurs within the state: A "state has jurisdiction to prescribe law with respect to conduct that, wholly or in substantial part, takes place within its territory...."

██ A state's criminal law may have extra-territorial effect. *See Strassheim v. Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1910) (upholding Michigan prosecution for acts of bribery and obtaining public money under false pretenses in Illinois); *Ross*, 646 A.2d at 1332–32. Long ago states recognized the need and right to enforce their criminal laws to protect themselves and their citizens from the injurious acts of others, "wherever committed." *People v. Tyler*, 7 Mich. 161, 221 (1859). Because substantial elements of the crimes took place in Arizona, we need not consider whether the murder

committed on foreign soil had a substantial effect in Arizona to assert jurisdiction over the crimes. We hold only that, on the facts of this case, Arizona did not violate international law or exceed its sovereign power by prosecuting Defendant for conspiracy and murder, even though the blow was struck and death occurred in Mexico.

**C. Even if Arizona had sovereign power, does A.R.S. § 13–108 confer jurisdiction over acts that take place in a foreign country?**

Defendant next argues that if a legislative body does not expressly extend the reach of a statute to a foreign country, courts should construe the statute narrowly to apply it only within the United States, citing *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949), and *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922). He points out that A.R.S. § 13–108 and MPC § 1.03, the textual basis for A.R.S. § 13–108, do not expressly apply to foreign nations. Thus, Defendant posits, MPC § 1.10 implies that A.R.S. § 13–108 only covers acts committed in other states of the union. Accordingly, Defendant says, § 13–108 should be interpreted as conferring extra-territorial jurisdiction only for crimes within other states, not for a crime in Mexico.

The cases Defendant cites do not carry his argument. *Bowman* reaches the opposite result, holding that a federal fraud statute applies to a crime consummated outside the territorial limits of the United States, even though the statute itself did not expressly say so. 260 U.S. at 98, 43 S.Ct. at 41. *Foley Bros.*, a civil case, held the Eight–Hour Workday law inapplicable to the employees of an American company doing business in Iraq and Iran. The Court explained that congressional intent and the legislative scheme may be considered in addition to the statute's text. 336 U.S. at 285, 69 S.Ct. at 577 ("[The] legislation of Congress, *unless a contrary intent appears*, is meant to apply

**9.** A state of the United States "may exercise jurisdiction on the basis of territoriality, *including effects within the territory,* and, in some respects at least, on the basis of citizenship, residence, or domicile in the State." (Emphasis added).

only within the territorial jurisdiction of the United States.").

We do not find these cases helpful. When interpreting nonjurisdictional, substantive statutes like those in *Foley Bros.* and *Bowman,* we ordinarily assume the substantive reach of a law is contained within the territorial borders of the enacting jurisdiction to avoid conflicts with other jurisdictions. But when jurisdiction is the very substance of a statute, we must look carefully at its language to determine its intended reach. The statutes examined in the cases cited by Defendant concerned substantive matters, not jurisdiction.

█ Section 13–108, however, specifically addresses extra-territorial jurisdiction. It is worded broadly, referring to "conduct outside this state" and conduct "in another jurisdiction." Its text does not expressly limit jurisdiction to other states. Had the intent been to apply the statute only to other states of the United States, appropriate limiting words could have easily been used. To ascertain legislative intent, we look first to the text and purpose of the statute. *Hernandez–Gomez v. Leonardo,* 180 Ariz. 297, 301, 884 P.2d 183, 187 (1994), *petition for cert. filed,* 63 U.S.L.W. (U.S. Jan. 27, 1995). In the absence of express limiting language or apparent contrary intent, we should not limit the extra-territorial reach of a statute intended to confer extra-territorial jurisdiction. Because the text of § 13–108 may fairly be construed to give Arizona jurisdiction "over crimes having any 'contact' with this state," *see* 1 RUDOLPH J. GERBER, CRIMINAL LAW OF ARIZONA 108–1 (2d ed. 1993), criminal jurisdiction should reach the extent permitted under federal and international law. There being no textual limit on the reach of this statute conferring extra-territorial power, we conclude that the statute includes, on its face, offenses consummated in foreign countries as well as in other states and that it was properly applied by the trial court.

## D. So construed, does A.R.S. § 13–108 violate the Constitutions of the United States and Arizona by extending territorial jurisdiction beyond Arizona's borders?

█ Defendant offers two arguments for the proposition that § 13–108 violates the Sixth Amendment of the United States Constitution[10] and art. 2, § 24 of the Arizona Constitution.[11] The first is that both constitutions require that a criminal defendant be tried in the district or county where the crime was committed. Defendant argues that this assures that the state where a crime was completed can punish the offender or extradite the offender to another jurisdiction. *Huntington v. Attrill,* 146 U.S. 657, 669, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892).

█ Standing alone, the Sixth Amendment protects individuals against action taken by the United States, not against state action. *Dodge v. Nakai,* 298 F.Supp. 17, 22 (D.Ariz.1968). Although other provisions of the Sixth Amendment have been incorporated into the Fourteenth Amendment as limitations on state action, *see Duncan v. Louisiana,* 391 U.S. 145, 148–49, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491, *reh'g denied,* 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412 (1968), the venue, or vicinage, provision at issue here has not. Therefore, the Sixth Amendment provision arguably is not applicable to state prosecutions.[12] *Caudill v. Scott,* 857 F.2d 344, 345 (6th Cir.1988); *Cook v. Morrill,* 783

---

10. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury *of the State and district wherein the crime shall have been committed,* which district shall have been previously ascertained by law.... (Emphasis added.)

11. In criminal prosecutions, the accused shall have the right to appear and defend in person, and ... to have a speedy public trial by an impartial jury *of the county in which the offense is alleged to have been committed....* (Emphasis added.)

12. The Sixth Amendment's vicinage provision technically prescribes that jurors will be selected from the geographical area in which the crime occurred. 2 CHARLES WRIGHT, FEDERAL PRACTICE & PROCEDURE § 301, at 190 (2d ed. 1982). The Supreme Court has interpreted this provision additionally as a requirement to fix "the situs of the trial in the vicinage of the crime," thereby establishing venue. *Johnston v. United States,* 351 U.S. 215, 220, 76 S.Ct. 739, 742, 100 L.Ed. 1097 *reh'g denied,* 352 U.S. 860, 77 S.Ct. 23, 1 L.Ed.2d 69 (1956).

F.2d 593, 596 (5th Cir.1986) ("right to a trial in the district where the defendant committed the crime is not ... fundamental and essential to a fair trial").

Further, Defendant erroneously assumes that the crime occurred in and only in Mexico. In fact, essential elements of offenses defined in Arizona's criminal code occurred in Arizona. *Poland,* 132 Ariz. at 275, 645 P.2d at 790 ("When the elements of a crime are committed in different jurisdictions, any state in which an essential part of the crime is committed may take jurisdiction."). Premeditation, an element of first-degree murder, and an agreement to commit a felony, an element of conspiracy, occurred in Arizona.

Arizona's extra-territorial jurisdiction statute accomplishes precisely what Defendant alleges to be the purpose of art. 2, § 24 and the Sixth Amendment: it gives Arizona the power to prosecute and punish those who engage in criminal conduct within Arizona's territory, whether or not the crime was fully completed here. *See, e.g., State v. Suarez,* 137 Ariz. 368, 375, 670 P.2d 1192, 1199 (App. 1983). Any other rule would make Arizona's interest in deterring criminal conduct subject to the prosecutorial whim of whatever jurisdiction happened to be the locus of the final act.

▆ Defendant's second argument is that § 13–108 effectively amends the Sixth Amendment and art. 2, § 24 by replacing the terms "crime" and "offense" with the words "conduct constituting an element of the offense," thereby giving Arizona courts the power to unilaterally seize a defendant and try him for crimes committed outside its geographic jurisdiction. This argument fails to recognize the distinction between venue and jurisdiction.[13] We do not read the constitutional text to concern anything other than vicinage. These provisions are designed to guarantee a criminal defendant the right to trial by an impartial jury. *See State ex rel. Sullivan v. Patterson,* 64 Ariz. 40, 47, 165 P.2d 309, 313 (1946) ("[I]t is *the right of trial by an impartial jury* in the county in which the offense is alleged to have been

committed that is preserved rather than the absolute right to a trial in the county.") (emphasis added); *State v. Mohr,* 150 Ariz. 564, 566, 724 P.2d 1233, 1235 (App.1986); *accord People v. Caruso,* 119 Ill.2d 376, 116 Ill.Dec. 548, 554, 519 N.E.2d 440, 446 (1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988). The purpose of requiring a criminal defendant to be tried before a jury of "the State and district wherein the said crime shall have been committed" was to prohibit the government from choosing a tribunal favorable to its case and give the defendant the right to be tried by jurors from the locality in which criminal conduct occurred. *Travis v. United States,* 364 U.S. 631, 634, 81 S.Ct. 358, 360, 5 L.Ed.2d 340 (1961).

▆ Clearly, vicinage is a venue rather than a jurisdictional question. While jurisdiction is the power of a court to try a case, venue concerns the locale where the power may be exercised. *Caruso,* 116 Ill.Dec. at 554, 519 N.E.2d at 446; *Lane,* 388 So.2d at 1026; 2 WAYNE R. LaFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 16.1(a), at 334–35 (1984). The constitutional provisions in question do not impose limits on the state's jurisdictional authority, only on the place where the defendant may be tried. *See United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 250–51, 89 L.Ed. 236 (1944).

Thus, Defendant *was* tried in the Arizona vicinage in which his alleged criminal conduct occurred, and this is all the constitution guarantees. A defendant who commits only part of an offense in Arizona cannot invoke the vicinage clause as a shield from prosecution in Arizona. Without extra-territorial jurisdiction, a defendant such as Willoughby could occasionally escape justice altogether.[14]

**E. Can Arizona impose the death penalty for a murder committed in a country that has no death penalty?**

▆ Defendant next argues that because Mexico has no death penalty, Arizona may not exercise jurisdiction or impose the death

---

13. *See supra* note 6.

14. One such scenario is the placement of a bomb on an airplane by a terrorist, causing the airplane to explode over the ocean.

penalty in this case. First, Defendant cites *Miller*, 157 Ariz. 129, 755 P.2d 434, for the proposition that international law controls if state law conflicts with international law or the laws of another country. Thus, Defendant submits, imposition of the death penalty conflicts with international law.

*Miller* is inapplicable both factually and in principle. Miller was arrested in Utah, extradited to Arizona, and charged here with theft for receiving stolen property. The property had been stolen in Arizona by others, and Miller helped the original thieves dispose of the stolen property in Nevada. Miller was not an Arizona resident and had not entered Arizona. While noting that under § 13–108(A)(1) the results of a person's extra-territorial criminal conduct could subject him to prosecution in Arizona,[15] the court concluded that Miller's extra-territorial conduct was not sufficiently related to the crime in Arizona. He caused only a continuing deprivation of an Arizona resident's property. *Id.* at 134, 755 P.2d at 439. Because the relationship between conduct and results was too attenuated, Arizona had no jurisdiction; "Arizona must conform to international law in its exercise of extra-territorial jurisdiction." *Id.*

This case presents no such conflict with international law. The state does not premise its jurisdiction over Defendant on the results theory it sought to apply in *Miller*. Instead, the state asserts jurisdiction pursuant to the element clause in § 13–108(A)(1), which is a proper basis for exercising jurisdiction. *See* RESTATEMENT § 402(1)(a); MPC § 1.03(1)(a); ARIZONA CRIMINAL CODE COMMISSION COMMENTARY at 20. We see no conflict between this portion of Arizona's law and international law.

Next, Defendant argues that Arizona's imposition of the death penalty conflicts with the Mexico–United States extradition treaty, which, in Art. 8, permits a party to refuse extradition in death penalty cases.[16] The treaty establishes a mechanism for surrendering individuals from the custody of one country to the custody of another under prescribed circumstances and only when the treaty is invoked. *United States v. Alvarez–Machain*, 504 U.S. 655, 664, 112 S.Ct. 2188, 2194, 119 L.Ed.2d 441 (1992). Parties to an extradition treaty may exert their legislative policies on each other by enumerating the offenses for which a person may be extraditable. *Hu Yau–Leung v. Soscia*, 500 F.Supp. 1382, 1384 (E.D.N.Y.1980), *rev'd on other grounds*, 649 F.2d 914 (2d Cir.), *cert. denied*, 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981). But unless the treaty is invoked by one of the countries, there can be no basis for claiming that the policies of one country impermissibly conflict with the policies of the other. *See United States v. Verdugo–Urquidez*, 939 F.2d 1341, 1357 (9th Cir.1991) (rights under a treaty are recognized only when the affected foreign government registers a protest), *judgment vacated on other grounds*, —— U.S. ——, 112 S.Ct. 2986, 120 L.Ed.2d 864 (1992).

Mexico did not invoke the treaty. Mexico cooperated with Arizona's prosecution of Defendant. Extradition was not an issue because Mexican authorities made no effort to extradite or prosecute Defendant, an Arizona resident arrested in Arizona. Even if Mexico wished to have Arizona's assurance that Arizona would not impose the death penalty, it was not in a position to obtain it. Such a right belongs only to the party having custody of the defendant.[17] We conclude that the

---

**15.** Again, in relevant part, A.R.S. § 13–108(A)(1) provides:
 This state has jurisdiction ... if ... [c]onduct constituting any element of the offense or a *result* of such conduct occurs within this state. (Emphasis added.)

**16.** Article 8 of the extradition treaty between the United States and Mexico, which was signed May 4, 1978, states:
 When the offense for which extradition is requested is punishable by death under the laws

of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.
31 U.S.T. 5059, 5065 (1979).

**17.** *See supra* note 15.

application of A.R.S. § 13–108 to this case does not violate international law.

## TRIAL ISSUES

### A. Did the court err in denying Defendant's motion for acquittal?

Defendant claims the trial court erred in denying his motion for acquittal on both counts. *See* Ariz.R.Crim.P. 20. In reviewing the evidence, this court examines the facts in the light most favorable to sustaining the verdict and resolves all reasonable inferences against the defendant. *State v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). We will reverse a trial court's denial of a Rule 20 motion if probative facts in support of a conviction were absent. *State v. Mathers*, 165 Ariz. 64, 66, 796 P.2d 866, 868 (1990).

#### 1. *First-degree murder*

■ The record provides ample evidence to support the conviction for premeditated murder. The facts already recited and others in the record clearly establish not only Defendant's desire to be rid of his wife but a motive for the killing (insurance money), a means (a homemade weapon), and a scheme (a family vacation in Mexico and a mock robbery) to accomplish that result. The uncontroverted facts show that the plan was consummated.

There was substantial evidence that Defendant was the killer. From a distance, Ysenia saw Defendant and his children file out of the condo and get into the family van; Defendant go back inside the house, leaving his children in the van; and Defendant's daughter Marsha get out of the van and go to the condo. Marsha told several people that the door to the condo was locked and that shortly after she tried to open the door Defendant reappeared and strongly discouraged her from going inside. Ysenia then observed Marsha and Defendant get back into the van and drive away. Ysenia said that she then drove to the house, opened the back door left unlocked by Defendant, called to Trish, grabbed some blunt knives from the kitchen, found Trish lying unconscious on the bed,

tried to stick the knives into her, took some rings and money, scattered the contents of Trish's purse, and left. Ysenia's fingerprints were found inside the house, and she had Trish's rings in her possession when she was stopped at the border.

There was strong evidence of each element of first-degree murder—intent, premeditation, and an act that caused the death of the victim.

#### 2. *Conspiracy*

Defendant was charged with one count of conspiracy with five predicate offenses enumerated. If the conspiracy to commit murder is sufficiently supported, we need not discuss the other conspiracy allegations. *See State v. Ortiz*, 131 Ariz. 195, 205, 639 P.2d 1020, 1030 (1981) ("When an indictment charges a single conspiracy with multiple objects, a conviction will stand if the prosecution proves the defendant guilty of conspiracy to commit any one of the objects."), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982).

■ The elements of conspiracy to commit murder are intent to promote the offense of murder and an agreement with another that one will do the actual killing. A.R.S. § 13–1003(A); *State v. Apelt*, 176 Ariz. 349, 360, 861 P.2d 634, 645 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994). Because murder is a felony upon the person of another, an overt act in furtherance of the offense is not required to convict for conspiracy. A.R.S. § 13–1003(A). The evidence described above clearly supports a jury finding that Defendant intended and agreed with Ysenia to commit murder. The overt acts jointly performed by Defendant and Ysenia confirm that there was an agreement between them. Thus, the court did not err in denying Defendant's motion for acquittal.

### B. Did the court err in questioning jurors about their views on the death penalty?

■ Defendant alleges that the court violated his Sixth Amendment right to a fair and impartial jury by asking voir dire ques-

tions seeking jurors' views on the death penalty. Two prospective jurors were excused after they said that they could not convict at all, knowing that Defendant might be given a death sentence. Death qualifying jurors, he argues, is a religious qualification that begets a jury biased in favor of capital punishment and therefore violates art. 2, § 12 of the Arizona Constitution.

This argument runs contrary to our past rulings. *State v. White,* 168 Ariz. 500, 509, 815 P.2d 869, 878 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992); *State v. Fisher,* 141 Ariz. 227, 249, 686 P.2d 750, 772, *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984). Article 2, § 12 of the Arizona Constitution prohibits disqualifying a juror because of his or her religious views. Although religious beliefs may motivate one's opinion about the death penalty, the beliefs themselves are not the basis for disqualification. In *Fisher,* we stated that a "person whose religious beliefs prevent him or her from finding a defendant guilty, notwithstanding proof beyond a reasonable doubt ..., is not impartial." 141 Ariz. at 249, 686 P.2d at 772. We echoed these words recently in *State v. West,* 176 Ariz. 432, 440, 862 P.2d 192, 200 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994), and continue to believe that the crux of a fair trial is the ability of the trier of fact to render a verdict based on the facts and applicable law. Excusing a juror whose religious beliefs prevent him from meeting that standard does not violate art. 2, § 12 of the Arizona Constitution. *White,* 168 Ariz. at 509, 815 P.2d at 878.

**C. Was it reversible error for the prosecutor to ask a witness about Defendant's "Mafia connections"?**

The prosecution elicited testimony from witnesses concerning Defendant's alleged connection with the Mafia. Defendant claims that this improperly referred to bad character and violated Ariz.R.Evid. 404(a). Defendant argues that the Mafia link question was so prejudicial that it constituted fundamental error.

 Because Defendant did not object to the questioning at trial, he waived his objection, and we review only for fundamental error. *West,* 176 Ariz. at 445, 862 P.2d at 204. Error is fundamental when it deprives the defendant of a right essential to the defense or to a fair trial. *State v. Cornell,* 179 Ariz. 314, 329, 878 P.2d 1352, 1367 (1994).

 Ysenia testified that Defendant told her his Mafia connections refused to kill Trish. Jack Mielke testified that he did not warn Trish of the murder scheme out of fear for his life after learning from Defendant that Defendant was connected with the Mafia. An investigator from the Attorney General's Office testified that he did not uncover any evidence that the Mafia owed Defendant any favors, although he did find evidence of Mafia connections. Admission of some or all of this testimony over proper objection might constitute error or even abuse of discretion. *See* Ariz.R.Evid. 404(a). There was, however, no objection. Moreover, Ysenia's testimony was relevant to prove intent or premeditation before the murder. Jack Mielke's testimony explained why he failed to tell Trish or authorities about his discussions with Defendant and supported his credibility. The investigator's testimony regarding Mafia ties was elicited by Defendant during cross-examination to attack Ysenia's credibility and by the prosecutor on redirect to rehabilitate her credibility.

We conclude that the danger of unfair prejudice on this record was not so great that any error could be described as fundamental.

## SENTENCING ISSUES

### A. Summary Issues

#### 1. *Constitutionality of non-jury sentencing*

 Arizona excludes jurors from the sentencing process. A.R.S. § 13–703(B). Defendant argues this violates the Equal Protection Clause of the Fourteenth Amendment. This same claim was recently rejected in *State v. Landrigan,* 176 Ariz. 1, 6, 859 P.2d 111, 116, *cert. denied,* —— U.S. ——, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993).

### 2. *Constitutionality of Arizona's death penalty scheme*

■ Defendant next argues that Arizona's death sentencing procedure is unconstitutional because it fails to objectively channel the trial court's discretion. We recently rejected this argument in *West*, 176 Ariz. at 454, 862 P.2d at 214.

## B. Were Defendant's due process rights violated by denial of his motion for a continuance to allow more witnesses at the sentencing hearing?

■ The jury returned its verdict on May 19, 1992. The sentencing hearing did not begin until August 5, 1992. The state called no witnesses, but Trish's mother gave a statement as a victim. Defendant called twelve witnesses the first day of the hearing and five more the next day. Another witness was scheduled but did not testify because Defendant's counsel did not feel there was enough time left that day. Instead, the court ordered a continuance for a psychological examination of Defendant. The sentencing hearing reconvened on September 22 to examine the psychologist's report. Defense counsel requested another continuance so that he could talk with the psychologist and file an untimely motion for a new trial. The judge granted the request over the state's objection and continued the hearing to October 26, stating his intention to conclude the process without further delay. Defense counsel indicated he intended to call only the psychologist as his final witness.

At the October 26 hearing, defense counsel said that he was prepared only to argue the motion for a new trial. The judge reminded him of the court's previous admonition that he would conclude the sentencing hearing that day, and counsel agreed that he had told the court he would be prepared to do so. The following exchange then occurred:

The Court: If there were other witnesses like the many people that you produced in the two days of our previous session, I would think it would be unnecessary to produce more of the same. If you have other witnesses on other issues, please tell me who they are and give me some indication of what you expect them to say, so that I can evaluate whether we need to recess to hear what they would have to say.

Defense Counsel: Your honor, the witnesses that I had intended to call were basically of the same type and character of the ones that I had previously produced. I did not subpoena a couple of them. They are not here. But I will state to the court that they would not be raising or bringing up any new issues that had not been previously raised at my prior, earlier mitigation hearing.

The judge then informed defense counsel that he would only hear final arguments from the state and defense counsel and any statement Defendant wished to make. At the end of the hearing, the judge sentenced Defendant to death.

Defendant correctly argues that a court must consider all mitigating aspects of a defendant's character and circumstances before imposing a capital sentence. *State v. Brewer*, 170 Ariz. 486, 504, 826 P.2d 783, 801, *cert. denied*, —— U.S. ——, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). Thus, defense counsel argues, rejection of relevant proffered testimony was clear error, violating Defendant's due process rights.

We disagree. The judge had already granted several continuances, which delayed sentencing for more than five months after the jury verdict, and had heard seventeen mitigation witnesses. It was well within the court's discretion to deny a further continuance for cumulative evidence, especially when counsel knew that the judge intended to proceed with sentencing that day. The court did not abuse its discretion in denying a continuance.

## C. Independent Review

■ When the death sentence is imposed by the trial judge, this court conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified. *Brewer*, 170 Ariz. at 500, 826 P.2d at 797.

At the sentencing hearing for first-degree murder, the trial court weighs aggravating

and mitigating circumstances to determine whether the death sentence is warranted. A.R.S. § 13–703. The state must prove aggravating circumstances beyond a reasonable doubt. *See* A.R.S. § 13–703(C); *Brewer,* 170 Ariz. at 500, 826 P.2d at 797. The defendant must prove mitigating circumstances by a preponderance of the evidence, but the trial court may consider evidence that tends to refute a mitigating circumstance. *State v. Lopez,* 174 Ariz. 131, 145, 847 P.2d 1078, 1092 (1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993).

### 1. *Did the trial court err in finding that Defendant committed homicide for pecuniary gain?*

The trial court found only one statutory aggravating circumstance [18]—murder in expectation of financial gain [19]—and no mitigating circumstances sufficiently substantial to call for leniency. Defendant challenges both findings.

■ Although the mere receipt of proceeds from an existing insurance policy will not satisfy the requirements of § 13–703(F)(5), *State v. Madsen,* 125 Ariz. 346, 353, 609 P.2d 1046, 1053, *cert. denied,* 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980), evidence is sufficient to support a finding of the (F)(5) factor if it shows that the defendant killed for financial gain. *White,* 168 Ariz. at 511, 815 P.2d at 880.

■ Evidence showed that Defendant pressed for a buyout agreement between Trish and her mother to ensure that Trish's share of their business would be liquidated on her death and distributed under her will. Integral to the agreement was the purchase of additional insurance on Trish's life. After the murder, Defendant received proceeds under one life insurance policy and tried to obtain proceeds from the policy used to fund the buyout agreement. The financial gain finding was also supported by Defendant's stated reason for killing rather than divorc-

ing his wife: she would have taken him "to the cleaners." We affirm the finding that Defendant murdered for financial gain.

### 2. *Mitigating evidence*

■ Defendant presented seventeen witnesses who testified that he has been a generous and compassionate co-worker, friend, neighbor, and family member. One witness related how Defendant offered monetary and moral support when the witness became too disabled to work. Another witness who had been out of work told the court that, without being asked, Defendant twice loaned him money, asking only that the witness repay the loans when he was able. A neighbor testified that Defendant helped her financially and in other ways to ensure her six children had shoes to wear, bicycles on their birthdays, and a decent house to live in. The witnesses believed Defendant performed these deeds without any expectation of collecting on them later.

Defendant was described as an active member in his church who often volunteered to conduct spiritual and educational visits to other members. Until Trish's death, her mother considered Defendant a good parent to his three children, two of whom he had adopted, and a good provider. Many witnesses observed Defendant to be patient, loving, and engaged with his own children and those of his neighbors. The bishop of his ward commended Defendant for his faithful service as counselor, church school teacher to young children, and Boy Scout leader. In brief, many people portrayed Defendant as a person who contributed substantially to their community.

The trial judge found this evidence credible. Acknowledging the evidence, he nevertheless concluded that it was not

> sufficiently substantial to call for leniency. With the defendant's concurrence, the court asked for a psychological "profile"

---

18. Although the prosecutor attempted to prove that Defendant committed the murder in an especially heinous, cruel, or depraved manner as another aggravating circumstance, the trial judge carefully reasoned that the evidence did not support such a finding beyond a reasonable doubt.

19. A.R.S. § 13–703(F)(5) establishes as an aggravating circumstance proof that "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

evaluation of the defendant; the same was done by Dr. K. Thomas Nelson, Ph.D., with assistance of his colleague, clinical psychologist David Biegen, Ph.D. The report, made available to counsel but now sealed to protect the privacy of the many people to whom Dr. Nelson talked, demonstrates that Defendant's essential character is fundamentally self-centered, with certain aggressive impulses to control other people, with defense mechanisms to compensate for perceived loss of control. Dr. Nelson and Dr. Biegen conclude that Defendant's apparently altruistic acts, described by witnesses at the presentence hearing before the court, are probably manifestations of these "defenses" to loss of control as well as elements of defendant's "over-controlled" personality. Thus, with the aid of this excellent report, the court concludes that the correct inference from the "good character" evidence is not that defendant had a good character (and thus was "a good man gone bad"), but that his acts were merely manifestations of the character traits which eventually led him to plan and execute the murder of his wife.

Special Verdict, Oct. 26, 1992, at 6. We believe that proof of a great number of past good deeds, even if prompted by impure psychological motives, has considerable mitigating value. Thus, a long record of significant good deeds for others and the community as a whole is entitled to substantial weight even if not entirely engendered by virtuous motives.[20]

■■■ On the other side of the scale, however, is the quality of the aggravating factor. In weighing, we do not simply count the number of aggravating or mitigating factors. *State v. Stuard,* 176 Ariz. 589, 610, 863 P.2d 881, 902 (1993). The quality and strength of each must also be considered. *State v. Barreras,* 181 Ariz. 516, 521, 892 P.2d 852, 857 (1995). This murder for pecuniary gain is not comparable to some crimes that might fall under that rubric. *Cf. State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990)

(defendant, caught burglarizing home and fired upon by homeowner, fired back and killed homeowner while escaping).

The killing in this case did not arise out of the heat of passion, fear, struggle, or attempt to escape. This killing was not just the result of momentary premeditation but of Defendant's deliberate, carefully conceived, meticulously planned, and cold-blooded scheme to kill, rather than divorce, his unsuspecting wife. In this respect it was very much like the cold and callous contract killing that may have prompted the promulgation of § 13–703(F)(5). *See State v. Clark,* 126 Ariz. 428, 437, 616 P.2d 888, 897 (Gordon, J., specially concurring and arguing that § 13–703(F)(5) applies only to circumstances in which the defendant is a hired killer), *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980).

In conclusion, although we disagree to some extent with the trial judge's evaluation of the mitigating facts and acknowledge that in many cases Defendant's record of significant good deeds and community service would weigh heavily in favor of leniency, given the strength and quality of the aggravating circumstance in this case, we agree with the trial judge that leniency is not appropriate. On balance, we conclude that Defendant's record of good deeds does not outweigh the aggravating factor.

### DISPOSITION

None of the issues raised by Defendant warrant reversal of his convictions. We have reviewed the entire record for fundamental error pursuant to A.R.S. § 13–4035 and have found none. We find one aggravating circumstance beyond a reasonable doubt. We find the mitigating circumstances are substantial, but under these facts not substantial enough to call for leniency. Accordingly, we affirm Defendant's convictions and death sentence.

MOELLER, V.C.J., and ZLAKET, J., concur.

---

**20.** Indeed, the psychologists did not pretend to understand or explain Defendant's past conduct or behavior in relation to the ghastly crime he committed. They could identify character and personality traits, but they did not claim that this provided a sufficient explanation of Defendant's conduct. Psychological Profile Report on Daniel Willoughby, Sept. 7, 1992.

MARTONE, Justice, concurring.

I join the court in affirming this conviction and sentence. I write separately to express my disagreement with the court's resolution of two important legal issues, one not raised on appeal by the defendant, and both unnecessary to the resolution of this case. I refer to the question of territorial jurisdiction: Who gets to decide it and by what standard?

The court concludes that "[i]n the very rare case in which jurisdiction is legitimately in issue because of contradicting jurisdictional facts, Arizona's territorial jurisdiction must be established beyond a reasonable doubt by the jury." *Ante*, at 538, 892 P.2d at 1327. But the court also concedes that "[o]n appeal, Defendant does not renew his argument that the jurisdictional question was for the jury." *Ante*, at 535, 892 P.2d at 1324. The court also concedes that "[t]here was no controverting evidence on the jurisdictional issue." *Ante*, at 539, 892 P.2d at 1328.

Thus, the court decides two important substantive issues, one of which is not raised by the defendant on appeal, and neither of which is presented by the facts of this case. I do not believe we should decide complex issues unless we must. We never know what the next case will present. The court says that "fundamental error doctrine requires us to reach this issue," *ante*, at 535 n. 2, 892 P.2d at 1324 n. 2. On the contrary, the court must decide whether there is error, and then whether it is fundamental. *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988). "Since there is no error, there is no occasion to reach the doctrine of fundamental error." *State v. Youngblood*, 173 Ariz. 502, 505 n. 2, 844 P.2d 1152, 1155 n. 2 (1993).

Nor does the nonwaivability of subject matter jurisdiction require us to reach these issues. First, subject matter jurisdiction is not in dispute. The Superior Court of Arizona is a trial court of general jurisdiction with subject matter jurisdiction over the offense as charged. But even if one categorized territorial jurisdiction under the heading of subject matter jurisdiction, the question of territorial jurisdiction has been raised by the defendant and we are deciding it. What has not been raised is the discrete legal issue of whether the judge or jury decides it.

Even if this case were an appropriate occasion to decide these complex issues, I would decide each of them differently. I subscribe to the view that the court, and not the jury, decides the question of territorial jurisdiction. *State v. Beverly*, 224 Conn. 372, 618 A.2d 1335 (1993); *Mitchell v. United States*, 569 A.2d 177 (D.C.App.1990). Jurisdiction is a question of law and thus the judge ought to make the findings necessary to support a conclusion that there is jurisdiction. *Cf.* Rule 43(i), Ariz.R.Civ.P. Many motions in both civil and criminal cases require the taking of evidence. These include motions to dismiss for lack of subject matter jurisdiction, motions to dismiss for lack of *in personam* jurisdiction, motions for transfer of venue, and many others. These sorts of motions raise legal issues and it is up to the judge to find whatever facts are necessary to support the appropriate legal conclusion. It seems anomalous to me to allow a jury to tell the court whether it has jurisdiction or not.

Nor do I agree that the better rule is that jurisdictional facts must be established beyond a reasonable doubt. Proof beyond a reasonable doubt is necessary to establish the elements of a crime but, as the court acknowledges, "[w]e do not, however, equate jurisdiction with elements of the offense." *Ante*, at 538, 892 P.2d at 1327. The jurisdiction of the court has nothing to do with the elements of a crime.[1]

Does the standard of proof really matter? I believe it can. It may well be that there is no proof beyond a reasonable doubt that any state has jurisdiction. But there may be proof by a preponderance of the evidence that one or more states have jurisdiction. Having imposed the reasonable doubt standard on jurisdiction, there may now be instances in which a criminal charge could be heard nowhere, even though the offense itself can be proven beyond a reasonable doubt. I

---

1. The court says that it "makes no sense in a single trial to require the factfinder to determine the existence of facts on the reasonable doubt standard for guilt purposes and the same facts on the preponderance standard for jurisdiction purposes." *Ante*, at 538, 892 P.2d at 1327. But under my view, it is not the *same* fact finder. The jury decides guilt. The judge decides jurisdiction.

thus favor a rule that, because territorial jurisdiction is not an element of the offense, the jurisdictional standard of proof is by the preponderance of the evidence. *People v. Cavanaugh,* 44 Cal.2d 252, 282 P.2d 53 (1955).

CORCORAN, Justice.

I concur with the majority and affirm both defendant's convictions and sentences, including the death sentence. However, because the defendant has not raised in this court, and the parties have not briefed, the question whether the judge or the jury is to determine the jurisdictional question, I would not decide it. I would await an appropriate case where the issue is both raised and briefed.

As to the issue of whether jurisdictional facts must be proved beyond a reasonable doubt or by a preponderance of the evidence, I agree with Justice Martone that the standard should be a preponderance standard.